667 F.2d 1074
 27 Fair Empl.Prac.Cas. 749,
27 Empl. Prac. Dec. P 32,287
BRONZE SHIELDS, INC., Percell Goodwyn, Ramon Gonzalez,
Hipolito Hernandez, Frank Howard, Jr., Willie C. Jackson,
Johnson Livingston, Claude Pittman, John W. Reid, Willie C.
Sanders, Marvin E. Thomas, Alonzo Williams, Rubin J. Battle,
Floyd Bostic, Jr., Lynette Crawford, Charles Harris, Olivia
Howard, Appellants,
v.
The NEW JERSEY DEPARTMENT OF CIVIL SERVICE, Ralph P. Shaw,
Chief Examiner of the Department of Civil Service, the New
Jersey Civil Service Commission, S. Howard Woodson,
President of the Civil Service Commission, Thomas DeLuca,
John Holden, Matthias Rodriguez and Charles Walther,
Commissioners of the Civil Service Commission, the City of
Newark, New Jersey, a municipal corporation, John Redden,
Director of the Newark Police Department.
 Nos. 80-2003, 81-1133.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 17, 1980.
Decided Dec. 1, 1981.
Rehearing and Rehearing In Banc DeniedDec. 28, 1981.
 
 Jonathan M. Hyman (argued), and Elizabeth M. Schneider, Rutgers Constitutional Litigation Clinic, Newark, N. J., and Jack Greenberg, and O. Peter Sherwood, New York City, N. Y., for appellants.
 John J. Degnan, Atty. Gen. of New Jersey, Erminie L. Conley, Asst. Atty. Gen., Peter J. Calderone, Deputy Atty. Gen. (argued), Trenton, N. J., for State appellees.
 John J. Teare, Acting Corp. Counsel, Matthew J. Scola, Asst. Corp. Counsel (argued), Newark, N. J., for appellees, City of Newark and Redden.
 Before VAN DUSEN, WEIS and HIGGINBOTHAM, Circuit Judges.
 OPINION OF THE COURT
 VAN DUSEN, Senior Circuit Judge.
 
 
 1
 Plaintiffs charged defendants in a two-count complaint with discriminating on the basis of race and ethnic origin in the hiring and promotion of police officers in the Newark, New Jersey, police department. Plaintiffs allege defendants have violated 42 U.S.C. § 1981 (count I)[1] and Title VII, 42 U.S.C. § 2000e et seq. (count II). The district court, 488 F.Supp. 723, granted defendants' motion for summary judgment on the § 1981 claim because plaintiffs had failed to allege or demonstrate any intent on the part of defendants to discriminate.[2] Intentional discrimination, the district court held, is a necessary element of a § 1981 cause of action. The district court dismissed the Title VII claim because plaintiffs had not filed charges with the Equal Employment Opportunity Commission ("EEOC") within the statutorily required 180 days.[3] Plaintiffs appeal both the summary judgment granted on count I and the dismissal of their claim under count II. We affirm the district court action on count I as to all except the Newark defendants (see page 4 below) and on count II as to all defendants.
 
 I. FACTS
 
 2
 To become a Newark police officer an applicant must first pass a written examination administered by defendant New Jersey State Department of Civil Service ("State Civil Service"). If the applicant passes this examination, he or she must pass a physical and medical examination, again given by the State Civil Service.[4] Those who successfully complete these examinations are placed on an eligibility roster in the order in which they scored on the written test.[5] This roster is distributed to the various municipalities, including defendant City of Newark ("Newark"). Defendant Newark then screens all those applicants listed on the eligibility roster. This screening includes, but is not limited to, an investigation of the applicant's character, personal life, reputation, a personal interview, and a psychiatric examination. Any applicant who does not withstand this screening process is removed from the roster. Newark hires recruits for its police department as needed from the eligibility roster in the order on the list.
 
 
 3
 Defendant State Civil Service also prepares an eligibility roster for the promotion of officers within municipal police departments. This roster is compiled on the basis of a written examination, years in service, and a service rating.
 
 
 4
 Plaintiffs include Bronze Shields, Inc., a non-profit New Jersey corporation whose purpose is to eliminate racial discrimination against policemen generally and, more specifically, to promote the employment and promotion of black police officers within the Newark police department. Individual plaintiffs include several applicants for the position of police officer in Newark who either failed the written civil service examination (Olivia Howard, Crawford, and Jackson), the physical or medical examination (Gonzalez and Hernandez), or the screening carried out by Newark (Livingston, Thomas, and Pittman). Plaintiffs Reid, Williams, and Frank Howard are Newark police officers who, for a variety of reasons, defendants did not place on the list of those eligible for promotion.
 
 
 5
 Defendants include the State Civil Service which is responsible for the development and administration of standards, including examinations, that condition the hiring and promotion of municipal police officers throughout the State of New Jersey. N.J.Admin.C. tit. 4:1-3.5. Defendant New Jersey State Civil Service Commission is subsumed under the State Civil Service. N.J.Admin.C. tit. 4:1-3.1. These defendants, and the individual defendants employed by the state, are referred to as the state defendants. The remaining two defendants, Newark and the supervisor of the Newark police department, are, in the following discussion, referred to collectively as Newark. Newark uses the state-prepared eligibility lists and its own screening procedures to determine the candidates eligible for hire by the police department.
 
 
 6
 Because the allegations in plaintiffs' complaint are important to the determination of all the issues presented, we describe them in detail. Plaintiffs first charge both Newark and the state defendants with racial discrimination for their respective roles in either promulgating or using the eligibility roster for the hiring of Newark police officers. The eligibility roster, as initially published by the State Civil Service, is based on written, physical and medical examinations. The written examination, plaintiffs charge, has a disproportionate impact on minorities: a larger percentage of blacks and Hispanics who take the examination fail as compared to whites. For those applicants who voluntarily disclosed their race, the following passed the civil service examination:
 
 
 7
 Spanish-speaking
 White Male Black Male Male
 ---------------- ---------------- ------------------
 Test No. % No. % No. %
 Date Passing Passing Passing Passing Passing Passing
-------- ------- ------- ------- ------- -------- --------
 5/ 8/72 567 43% 27 17% 6 10%
 6/19/72 233 60.8% 13 25% 3 100%
 7/17/72 614 66.1% 63 28.6% 16 25%
 9/22/72 236 62.3% 5 25% 3 25%
11/18/72 770 72.4% 78 39.8% 29 35.8%
 3/19/73 709 55.4% 21 20.6% 7 18.4%
 5/23/73 49.4% 19.4% 31.9%
 8/ 6/73 62.8% 28.1% 24.8%
 4/15/74 390 44% 6 13% 4 16%
 7/15/74 633 67% 16 25% 16 45%
 6/21/75 36.8% 14.5% 11.3%
 
 
 8
 The state-administered physical examination, plaintiffs contend, excludes a disproportionate number of Hispanic applicants because it requires that all candidates be 5 feet 7 inches tall. The two contested examinations, along with a medical examination, provide the basis for the roster promulgated by the state defendants and used by the Newark police department. The use of this eligibility roster, plaintiffs allege, results in a pattern of unlawful employment discrimination on the basis of race and ethnic origin. Newark, then, is charged with discrimination for its use of the eligibility roster; the state related defendants are charged with discrimination for the promulgation of the offending list.
 
 
 9
 Plaintiffs have charged Newark alone with employment discrimination because of the screening procedures it uses to further reduce the number of candidates on the eligibility roster. These screening procedures, only vaguely set out in the complaint, allegedly have a disproportionate impact on blacks and Hispanics, are not job related, and are applied arbitrarily.
 
 
 10
 Both the state defendants and Newark are accused of discriminating for their part in the promulgation or use of the eligibility roster used to promote, as compared to hire, officers within the Newark police department. New Jersey law, N.J.Admin.C. tit. 4:1-8.4.-6, requires that the State Civil Service consider three factors in compiling the eligibility list for promotions: number of years in service, service rating given by a supervisor, and score on a written examination. Consideration of years in service, plaintiffs claim, continues the effects of past discrimination. The service rating is a discretionary decision which, plaintiffs argue, reflects the bias and prejudice of the generally white decision maker. Finally, plaintiffs charge that the written promotion examination, administered by the State Civil Service, has a disproportionately negative effect on the promotional opportunities for blacks and Hispanics.
 
 II. THE PROCEDURAL HISTORY
 
 11
 Plaintiffs initially filed their complaint in 1972, alleging discrimination by defendants in violation of 42 U.S.C. §§ 1981 and 1983 and the Thirteenth and Fourteenth Amendments of the Constitution. No claim based on Title VII was made at that time. On November 26, 1974, the district court issued a preliminary injunction in favor of plaintiffs. This injunction required Newark to hire one black or Hispanic police officer for every two white officers hired.[6]
 
 
 12
 The Supreme Court announced its decision in Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), in June 1976. The Court in Washington required proof of intentional discrimination for constitutionally based claims of discrimination. Washington v. Davis, supra at 247-48, 96 S.Ct. at 2051-52. Because plaintiffs had not alleged any intentional discrimination, defendants moved to dismiss. The district court stayed the motion to await the outcome of a charge filed by plaintiffs with the EEOC challenging the same employment and promotion practices.
 
 
 13
 Six individual plaintiffs filed employment discrimination charges against defendants with the EEOC in July 1976, approximately one month after the announcement of the Washington decision. After receiving right to sue letters, these individuals amended the complaint and added count II, the claim based on Title VII. It is this amended complaint which is being considered here.
 
 
 14
 The district court first addressed the Title VII claim. On March 12, 1979, the court denied plaintiffs' motion to certify a class since plaintiffs had failed to file charges with the EEOC within the required 180 days.[7] Because of the untimely filing, plaintiffs' Title VII cause of action, count II, was dismissed on April 2, 1979.
 
 
 15
 The district court then returned its attention to the original count I, the § 1981, § 1983, and Thirteenth and Fourteenth Amendment claims.[8] The court entered summary judgment for defendants on count I on April 29, 1980. It held that claims based on § 1981, § 1983, or the Fourteenth Amendment[9] all require intentional discrimination as an element of the cause of action. Because no allegation or showing of intentional discrimination had been made, plaintiffs' count I claims could not withstand a motion for summary judgment.
 
 III. JURISDICTION
 
 16
 We first address this court's jurisdiction. Plaintiffs initially filed a notice of appeal on July 7, 1980, from the orders refusing to vacate the grant of summary judgment on count I and the dismissal of count II. The orders appealed from, however, did not rule on all attorneys' fees which plaintiffs had requested in their complaint. After the grant of summary judgment and dismissal, plaintiffs filed a separate petition for counsel fees which was denied by the district court on December 1, 1980. Plaintiffs filed a second appeal, No. 81-1133, on December 22, 1980, which did not challenge the denial of counsel fees but repeated the same grounds set out in the July 7, 1980, notice of appeal. Admittedly this second appeal was filed as a cautionary measure to insure that the court had jurisdiction in the event that the July 7, 1980, notice of appeal was premature.
 
 
 17
 The plaintiffs' apprehensions were well founded because in Croker v. Boeing Co., etc., et al., 662 F.2d 975 at 981 (3d Cir., 1981), this court concluded that an appeal taken before attorney's fees were determined was premature.
 
 
 18
 Plaintiffs' motion to consolidate the appeals at Nos. 80-2003 and 81-1133 has been granted, and hence this court has jurisdiction under No. 81-1133 to review the order filed December 1, 1980 (Document 141 in the District of New Jersey Civil No. 72-2022), and the orders included in the July 7, 1980, notice of appeal since they were repeated in the December 22, 1980, notice of appeal. The appeal at No. 80-2003 will be dismissed as premature in view of Croker, supra. We turn then to the merits.IV. THE TITLE VII CLAIM
 
 
 19
 Plaintiffs on appeal contest the district court's conclusion that the charges, filed with the EEOC against the state defendants and Newark, were untimely. The only charges which are of concern here are those based on the defendants' promulgation and use of the allegedly discriminatory hiring roster, not the promotion roster. The district court found that, of the plaintiffs who had filed Title VII charges, none had standing to challenge the eligibility lists used for promotion purposes[10] and plaintiffs do not contest this holding on appeal.[11] To further clarify what Title VII claims are not involved here, we note that plaintiffs do not argue they have standing to contend that the screening procedures used by Newark violate Title VII.[12] The only charges which we must determine as timely or untimely filed are those alleging discrimination resulting from the promulgation or use of the eligibility roster for hiring.
 
 
 20
 Pursuant to section 706(e) of Title VII, 42 U.S.C. § 2000e-5(e),[13] a charge of discrimination must be filed with the EEOC within 180 days after the alleged unlawful employment practice occurred.[14]
 
 
 21
 The specific facts pertinent to the timely filing issue are as follows. Plaintiffs Olivia Howard and Crawford took the examination for police officer candidates on January 18, 1975. In February 1975, they were notified they had failed. The State Civil Service promulgated the eligibility roster on May 3, 1975. This roster remained in effect for three years. Newark only used the roster once when it hired 27 recruits for police officer training in November 1977. Plaintiffs filed charges of discrimination with the EEOC on July 9, 1976.
 
 
 22
 The district court held that the allegedly discriminatory employment practice occurred with the promulgation of the eligibility roster published on May 3, 1975. The plaintiffs' EEOC charges, filed in July 1976, were not filed within 180 days of May 3, 1975, and therefore were untimely. Plaintiffs challenge this holding and argue that their filings were timely under either (A) the continuing violation theory or (B) the doctrine of equitable estoppel.[15]
 
 A. The Continuing Violation Theory
 
 23
 Plaintiffs first rely on the continuing violation theory to support the allegation that their discrimination charges were timely filed. Plaintiffs assert that the eligibility roster, based on the results of the allegedly discriminatory civil service examination, constitutes an unlawful employment practice which continued to violate Title VII for as long as the roster was in effect. The roster was in effect from May 1975 until at least November 1977. Plaintiffs filed charges with the EEOC in July 1976. Because they filed during the roster's effectiveness, plaintiffs assert their filings were timely.
 
 
 24
 The continuing violation theory has attracted widespread attention by commentators,[16] and has been employed by courts to expand the filing period available to Title VII complainants.[17] The liberal application of the congressionally mandated filing period is consistent with the remedial purposes of Title VII and the liberal interpretation to be given to all Title VII provisions.[18] The expansive application of the 180-day filing limit has been justified as permitting claims filed by lay employees unversed in the procedural niceties of the law.[19] Indeed, a Senate Conference Committee report specifically recognized and approved the courts' expansion of the statutory filing period through the use of the continuing violation theory.
 
 
 25
 "This subsection as amended provides that charges be filed within 180 days of the alleged unlawful employment practice. Court decisions under the present law have shown an inclination to interpret this time limitation so as to give the aggrieved person the maximum benefit of the law; it is not intended that such court decisions should be in any way circumscribed by the extension of the time limitations in this subsection. Existing case law which has determined that certain types of violations are continuing in nature, thereby measuring the running of the required time period from the last occurrence of the discrimination and not from the first occurrence is continued, and other interpretations of the courts maximizing the coverage of the law are not affected."
 
 
 26
 118 Cong.Rec. 7167. The Senate accepted this report by a vote of 62 to 10. 118 Cong.Rec. 7167, 7170. Finally, this court has recognized the continuing violation theory in Title VII cases, see Masco v. United Airlines, 574 F.2d 1127 (3d Cir. 1978); Bethel v. Jendoco Const. Corp., 570 F.2d 1168 (3d Cir. 1978); Wetzel v. Liberty Mutual Insurance Co., 508 F.2d 239, 246 (3d Cir.), cert. denied, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975), as have numerous other circuits.[20]
 
 
 27
 The continuing violation theory, however, cannot be considered only in the expansive light of extending the filing period in order to protect a person's civil rights. Confronting and limiting the continuing violation theory is the explicit statutory 180-day limit, enacted by Congress to "protect employers from the burden of defending claims arising from employment decisions that are long past." Delaware State College v. Ricks, 449 U.S. 250, 256-57, 101 S.Ct. 498, 503-04, 66 L.Ed.2d 431 (1980), citing Johnson v. Railway Express Agency, 421 U.S. 454, 463-64, 95 S.Ct. 1716, 1721-22, 44 L.Ed.2d 295 (1975); see United Air Lines v. Evans, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). Although many district courts and courts of appeals have favored the expansive interpretation of the continuing violation theory, the Supreme Court has, in its two most recent opinions on the subject, refused to apply the continuing violation theory. Delaware State College v. Ricks, supra; United Air Lines v. Evans, supra. Instead, as indicated above, the Court has emphasized the congressional intent to limit an employer's liability for stale claims.
 
 
 28
 "The limitations periods, while guaranteeing the protection of the civil rights laws to those who promptly assert their rights, also protect employers from the burden of defending claims arising from employment decisions that are long past. Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 463-464, 95 S.Ct. 1716, 1721-1722, 44 L.Ed.2d 295 (1975); see United Air Lines v. Evans, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977)."
 
 
 29
 Ricks, supra, 449 U.S., at 256-57, 101 S.Ct. at 503-04. Cf. International Union of Electrical Workers v. Robbins & Myers, Inc., 429 U.S. 229, 97 S.Ct. 441, 50 L.Ed.2d 427 (1976).
 
 
 30
 Because the Supreme Court's recent decisions, particularly Delaware State College v. Ricks, supra, persuade us that the use of the eligibility roster does not constitute a continuing violation, we forego discussing all of the cases decided before Ricks, supra, on the subject.[21]
 
 
 31
 The plaintiff in Ricks, a black Liberian, was formally denied tenure on March 13, 1974. Delaware State College, like many other educational institutions, does not immediately discharge faculty members who are denied tenure. Rather, such faculty members are offered one-year terminal contracts. Termination of employment, however, is a delayed but inevitable consequence of an unfavorable tenure decision. On June 26, 1974, Ricks was offered, and he accepted, a terminal, one-year contract. Meanwhile, Ricks filed a grievance which was denied on September 12, 1974. He filed charges with the EEOC on April 4, 1975. The district court determined that the filing period started to run on June 26, 1974, the date plaintiff was offered and accepted his terminal contract. The offer and acceptance of the terminal contract, as explained by the district court and accepted by the Supreme Court, marked the latest time at which Ricks knew the College was going to both deny him tenure and terminate his employment. The district court dismissed the case because plaintiff had failed to file within 180 days of accepting the terminal contract. The Supreme Court upheld the district court's dismissal, reversing this court's decision.
 
 
 32
 According to the Supreme Court in Ricks, supra, 449 U.S., at 257, 101 S.Ct. at 504, to determine the timeliness of an EEOC complaint, a court must "identify precisely the 'unlawful employment practice' of which (plaintiff) complains." In Ricks the plaintiff challenged the decision to deny him tenure. The Supreme Court held that the filing limitation period commenced at the time the tenure decision was made and fully communicated to Ricks. "That is so even though one of the effects of the denial of tenure-the eventual loss of a teaching position-did not occur until later.... The emphasis is not upon the effects of earlier employment decision; rather, it 'is (upon) whether any present violation exists.' " Id. at 257, 101 S.Ct. at 504 (emphasis in original), citing United Air Lines v. Evans, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977). See also Masco v. United Airlines, 574 F.2d 1127 (3d Cir. 1978). The Court explained that
 
 
 33
 "... termination of employment at Delaware State is a delayed, but inevitable, consequence of the denial of tenure. In order for the limitations periods to commence with the date of discharge, Ricks would have had to allege and prove that the manner in which his employment was terminated differed discriminatorily from the manner in which the College terminated other professors who also had been denied tenure. But no suggestion has been made that Ricks was treated differently from other unsuccessful tenure aspirants. Rather, in accord with the College's practice, Ricks was offered a one-year 'terminal' contract with explicit notice that his employment would end upon its expiration."
 
 
 34
 Ricks, supra at 257-58, 101 S.Ct. at 504-05.
 
 
 35
 Returning to the case before us, we must likewise identify precisely the unemployment practice of which plaintiffs complain and separate it from the inevitable, but neutral, consequences of the allegedly discriminatory practice. Plaintiffs complain of defendants' refusal to place them on the hiring roster. Accepting plaintiffs' allegations as true, the roster, because it arises from examinations which have a discriminatory impact, could constitute an unlawful employment practice. Plaintiffs received formal notice that they were not on the eligibility roster on May 3, 1975, the date of its formal promulgation. As of that date at the latest,[22] plaintiffs knew they would not be hired by the Newark police department for the next three years because they were not on the eligibility roster. Plaintiffs, however, did not file within 180 days of May 3, 1975.
 
 
 36
 Plaintiffs argue that Newark continued to discriminate against them by its use of the eligibility roster. This argument is unpersuasive. First, Newark never used the list prior to plaintiffs' filing charges with the EEOC.[23] Second, even if Newark had used the list, plaintiffs do not allege that Newark would have followed anything but a neutral, non-discriminatory procedure in hiring from the list. Newark's policy was simply to hire in order from the list.
 
 
 37
 The statute (42 U.S.C. § 2000e-5(e)) requires that "the person aggrieved" file charges within 180 days of "the alleged unlawful employment practice."[24] This statutory language indicates that some act must aggrieve the complaining party. The record does not show that the defendants acted in any way which aggrieved plaintiffs within the 180 days before plaintiffs filed their EEOC charge. The only act of which plaintiffs complain was the promulgation of the eligibility roster on May 3, 1975. Plaintiffs' EEOC charge was filed more than a year later, in June 1976, far more than 180 days after the list's promulgation, and therefore was untimely.
 
 
 38
 Newark's non-discriminatory policy as to the use of the roster is similar to Delaware State's non-discriminatory policy in discharging all faculty denied tenure. See Ricks, supra, 449 U.S., at 257-58, 101 S.Ct. at 504-05. Newark's refusal to hire plaintiffs, like Delaware College's discharge of Ricks, "is a delayed, but inevitable consequence" of the allegedly discriminatory employment procedure-here a specific, identifiable act, the promulgation of the hiring roster. It is unlike, therefore, a continuing practice such as in Bethel v. Jendoco, supra, which manifested itself only in individual hiring rejections.
 
 
 39
 Thus, we reject plaintiffs' argument that the continuing violation theory applies to the facts of this case.
 
 B. The Equitable Tolling Argument
 
 40
 Plaintiffs assert that their EEOC charges were timely filed because, for several reasons, the 180-day limit was equitably tolled.
 
 
 41
 The filing limits under Title VII are not jurisdictional and are subject to equitable tolling. Hart v. J. T. Baker Chemical Corp., 598 F.2d 829 (3d Cir. 1979); Laffey v. Northwest Airlines, Inc., 567 F.2d 429 (D.C.Cir.1976); DeMatteis v. Eastman Kodak Co., 520 F.2d 409 (2d Cir. 1975); Reeb v. Economic Opportunity Atlanta, Inc., 516 F.2d 924 (5th Cir. 1975). While recognizing that the filing limits of Title VII can be equitably tolled, we find no justification in equity to toll the filing limitation in this case. Cf. School District v. Marshall, 657 F.2d 16 (3d Cir. 1981).
 
 
 42
 Plaintiffs argue that they relied to their detriment on the established law prior to the Supreme Court case of United Air Lines v. Evans, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). This supposedly well-established law permitted them to file EEOC charges at any time while the violation continued. Evans, plaintiffs claim, reversed the prior law and precluded their reliance on the continuing violation theory.[25] Plaintiffs explain that if Evans is applied to this case, they will be unfairly penalized for relying on what had been clearly established law. Such an inequitable result, plaintiffs argue, is precluded by Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971).
 
 
 43
 In Chevron, when the plaintiff initially filed suit, it was commonly recognized that the three-year admiralty statute of limitations controlled his cause of action. Defendants did not question the timeliness of the filing. During pretrial discovery, the Supreme Court decided a case which reversed the established law and held that the shorter, one-year state statute of limitations applied. Although plaintiff had filed suit more than a year after his cause of action arose, the Court exercised its equity powers and refused to apply the newly announced law on limitations retroactively to plaintiff's case. His filing was held to be timely.
 
 
 44
 Plaintiffs cannot rely on Chevron for two reasons. First, Evans did not reverse clearly established law. The continuing violations theory was in its embryonic stages at the time the plaintiffs supposedly relied on it in 1975. Since then, the theory has been presented to numerous courts but has been erratically and inconsistently applied.[26] Reliance on such an uncertain doctrine to delay filing, when such a delay was not mandated by other considerations, was not reasonable. Second, plaintiffs themselves admit that their delay in filing resulted, not from a reliance on the continuing violation law prior to Evans, but rather from their mistaken belief that the original court action, based on § 1981, § 1983 and the Thirteenth and Fourteenth Amendments, would provide complete relief.[27] Plaintiffs apparently chose to rely on this court civil action rather than go through the often lengthy administrative proceedings which are a part of the Title VII process.
 
 
 45
 Equity does not provide for those who put all their eggs in one basket and refuse to take advantage of alternative avenues to relief. Plaintiffs should be encouraged to vindicate their rights, not only by means of the courts, but also by use of administrative processes. We therefore will not rely on the equitable principle utilized in Chevron to save plaintiffs' case.
 
 
 46
 Plaintiffs next argue that the filing period should be equitably tolled because the parties had been litigating the same issues ever since 1972.[28] This litigation, plaintiffs contend, gave notice to defendants of the employment discrimination charges and so satisfied one of the primary purposes behind the limited filing period-that of notifying the defendant so that necessary evidence and testimony could be preserved. Hart v. J. T. Baker Chemical Corp., 598 F.2d 829, 833 (3d Cir. 1979). We must, however, consider other purposes behind Title VII. Congress intended to limit an employer's liability by restricting the filing period. Ricks, supra, 449 U.S., at 257-59, 101 S.Ct. at 505-507. It also intended that, by having plaintiffs file with the EEOC before going to court, both parties would be subjected to the administrative pressure to reconcile their dispute. Here, by delaying filing, plaintiffs avoided the administrative pressures and, if they succeed, would expand the time period during which an employer is liable. These other purposes behind Title VII outweigh the purpose of notifying the defendant of upcoming litigation. Therefore, equity should not intervene.
 
 
 47
 Furthermore, the holding in Johnson v. Railway Express Agency, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), indicates that plaintiffs' equitable tolling argument is without merit. In Johnson, the Court concluded that the filing of Title VII charges with the EEOC does not toll the statute of limitations in a suit brought under § 1981. Id. at 461, 95 S.Ct. at 1720. This conclusion was based on the view that "the remedies under Title VII and under § 1981, although related, and although directed to most of the same ends, are separate, distinct and independent." Id. Because the claims are independent, the filing of charges under § 1981 will not toll the filing limit under Title VII.
 
 
 48
 Courts often rely on equity in Title VII cases where complainants are "lay persons unfamiliar with the complexities of the administrative procedures." Hart v. J. T. Baker Chemical Corp., 598 F.2d 829, 832 (3d Cir. 1979). Plaintiffs have been counseled since 1972 by able attorneys and so cannot rely on this as a basis for equity.
 
 
 49
 We do not decide whether, as defendants suggest, equitable tolling may only be invoked where the employer has, either through overreaching or concealment, impeded a plaintiff's prosecution of his Title VII claim. We simply hold that, under the facts of this case and for the reasons given above, the equities do not demand the tolling of the 180-day filing limitation.
 
 
 50
 Thus we affirm the district court's dismissal of plaintiffs' Title VII claim as untimely. The effectiveness of the eligibility roster does not, standing alone, constitute a continuing violation of Title VII. Plaintiffs have not presented any justification for equitably tolling the 180-day filing period.
 
 V. THE § 1981 CLAIM
 
 51
 Plaintiffs appeal the district court's grant of summary judgment for defendants on count I, the cause of action premised on 42 U.S.C. § 1981. The district court held that intentional discrimination is a necessary element of a § 1981 claim and that disproportionate impact, standing alone, does not give rise to an inference of intentional discrimination. For the reasons stated in Croker, et al. v. The Boeing Co., etc., et al., 662 F.2d 975 at 984 (3d Cir. 1981), we agree.
 
 
 52
 The district court further found that, because plaintiffs had only alleged and presented evidence of disproportionate impact, both defendants were entitled to summary judgment. We agree for the most part and will affirm the summary judgment in favor of the State Civil Service. We will, however, reverse in part the summary judgment in favor of Newark.
 
 
 53
 Plaintiffs did not allege, either initially or when they amended the complaint in 1977, that any of the defendants intended to discriminate. Given the liberal interpretation to be accorded pleadings, Foman v. Davis, 371 U.S. 178, 181-82, 83 S.Ct. 227, 229-30, 9 L.Ed.2d 222 (1962), we will explore the facts as stated in the complaint and affidavits to determine whether any allegations, together with a showing of disproportionate impact, could establish the necessary intent.
 
 
 54
 Our examination of the record as to the state defendants has not revealed facts which, even in conjunction with a showing of disproportionate impact, would support an allegation of intentional discrimination. The summary judgment for the state defendants will be affirmed.
 
 
 55
 Plaintiffs argue that Newark intentionally discriminates by means of its screening process. The screening process does eliminate a disproportionate number of blacks and Hispanics as compared to whites from the hiring roster (Plaintiffs' Complaint, P 34 at A 22; Affidavit of Purnell Benson, A 225; Supplemental Answers to Plaintiffs' Interrogatories, A 239). Furthermore, the screening procedure is "susceptible of abuse" on the basis of racial discrimination. See Castenda v. Partida, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977). Newark apparently can discover the applicant's race in a variety of ways, including a personal interview. Armed with this knowledge, Newark could, given the opportunity, make discriminatory hiring decisions. Allegedly, the person authorized to remove applicants from the eligibility roster has "wide discretionary powers which are exercised arbitrarily and without regard to ascertainable standards" (Plaintiffs' Complaint, P 34-C, at A 22).[29] If this is true, Newark could intentionally discriminate by means of the screening procedure used in hiring police officers. Had plaintiffs been allowed to present evidence on the mechanics and actual operations of the screening process, the fact finder might have been persuaded to infer Newark intended to discriminate in hiring police officers.
 
 
 56
 We hold that plaintiffs' complaint and supporting affidavits, because they allege disproportionate impact and opportunity to intentionally discriminate by the exercise of arbitrary discretion, entitle plaintiffs to an opportunity to support the charge of intentional discrimination against Newark.[30] This holding does not mean that disproportionate impact, coupled with an opportunity to intentionally discriminate, constitutes discriminatory intent as a matter of law. To prove intentional discrimination, the opportunity to discriminate must be shown to have been exploited. The case before us, however, has not progressed to the proof stage. It must be remembered that this case is here on appeal from an order granting summary judgment for defendants on the § 1981 cause of action. Because this claim requires proof of intent, an element difficult to establish, summary judgment should be granted with caution. Foster v. Swift & Co., 615 F.2d 701, 702 (5th Cir. 1980); Hayden v. First National Bank of Mt. Pleasant, 595 F.2d 994, 997 (5th Cir. 1979).
 
 
 57
 Read in a light most favorable to plaintiffs, we find there is a dispute over a material fact: whether Newark intentionally discriminated on the basis of race by means of its screening procedure. The order granting summary judgment to defendant Newark and the superintendent of the Newark police department must, therefore, be vacated and the case remanded.
 
 VI. CONCLUSION
 
 58
 The order of summary judgment on count I, the § 1981 claim, granted to defendants New Jersey Department of Civil Service, New Jersey Civil Service Commission, and all individual defendants employed by either of these two defendants will be affirmed. The count I summary judgment order in favor of Newark and the director of the Newark police department will be reversed in part. On remand, the district court need only consider whether Newark intentionally discriminated during the applicable limitations period by means of its allegedly arbitrary and standardless screening procedures. The summary judgment for Newark based on its liability for using the eligibility rosters either for hiring or promotion will be affirmed.
 
 
 59
 The dismissal of count II, the cause of action under Title VII, will be affirmed as to all defendants.
 
 
 60
 The motion to dismiss the appeal at No. 81-1133 will be denied.
 
 
 61
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge, dissenting and concurring.
 
 
 62
 This case presents two difficult issues for our consideration. The first involves deciding the timeliness of Title VII charges filed with the EEOC against the State of New Jersey and the City of Newark. The second concerns the applicable standard of proof to be applied to a 42 U.S.C. § 1981 claim. Because I have concluded that the alleged acts of discrimination constitute a continuing violation, I dissent to the majority's conclusion that the EEOC charges were not filed timely. As to the § 1981 issue, it is my belief that a showing of disproportionate impact satisfies § 1981. However, since I am bound by our court's recent en banc decision in Croker v. The Boeing Co. (Vertol Division), 662 F.2d 975 (3d Cir. 1981), holding that intentional discrimination must be shown in § 1981 cases, I concur in the judgment of the majority.
 
 I.
 FACTS
 
 63
 The majority's opinion has cogently and lucidly set forth the complex factual and procedural history of this case. My recitation will be more in the nature of a summary than a disagreement with the facts which have been noted by the majority.
 
 
 64
 The New Jersey State Department of Civil Service administers a state-wide employment procedure consisting of a written test and a physical and medical examination. All applicants seeking to be police officers must pass the written component of the employment procedure before they can attempt to qualify physically and medically. The State Civil Service ranks the applicants on an eligibility roster according to their scores on the written test, except for veterans who receive an absolute preference. The eligibility list is then forwarded to the various municipalities seeking to hire police officers. In the case of the defendant, City of Newark, secondary screening procedures of eligible candidates are employed, including subjective background investigations, personal interviews and psychiatric examinations. Newark meets its needs for new police officers exclusively from the state promulgated list minus candidates who have failed the City's screening. A similar roster governs promotions and is compiled on the basis of a written examination, years in service and a service rating.
 
 
 65
 Plaintiffs in this action consist of black and Hispanic individuals who have taken and failed some portion of either the State Civil Service's examination relating to initial employment or promotion or Newark's secondary screening process and Bronze Shields, Inc., a non-profit New Jersey corporation dedicated to the eradication of racial discrimination in the employment and promotion of police officers in the Newark police department. In a single count complaint filed in 1972, alleging violations of 42 U.S.C. §§ 1981 and 1983 and the thirteenth and fourteenth amendments to the United States Constitution, the plaintiffs sued the State Civil Service, various state officials, the City of Newark and the supervisor of the Newark police department. The gist of the complaint was that both the Newark and the state defendants impermissibly discriminated against plaintiffs on the basis of race by employing an eligibility list premised on a written and physical examination which disproportionately excluded black and Hispanic candidates. It was further alleged that Newark's use of the screening process unlawfully discriminated against the plaintiffs. Finally, it was alleged that both the state and Newark defendants violated plaintiffs' rights by promulgating and using a discriminatory promotion list.
 
 
 66
 On November 26, 1974, the district court responded to the plaintiffs' complaint by issuing a preliminary injunction against the defendants. The injunction required Newark to adopt a hiring formula whereby one black or Hispanic candidate was to be hired for every two white candidates hired. This formula was intended to correct an imbalance in the percentage of black and Hispanic males who did not pass the written civil service examination.[1]
 
 
 67
 Approximately a year and a half after the lower court's injunction decision, the Supreme Court announced its decision in Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) requiring proof of intentional discrimination for fourteenth amendment based claims. One month after Washington v. Davis six individual plaintiffs filed charges with the EEOC. The plaintiffs did not allege intentional discrimination in their original complaint. The EEOC issued right to sue letters and the plaintiffs amended their complaint to add a second count based on Title VII.
 
 
 68
 On April 2, 1979 the district court dismissed the plaintiffs' Title VII count because the charges had not been filed with the EEOC within the statutorily mandated 180 days. The defendants moved for summary judgment on the remaining original count. The lower court granted the motion on April 29, 1980 holding that § 1981, § 1983 and constitutionally based claims all require a showing of intentional discrimination. The plaintiffs moved to vacate the summary judgment and to amend their complaint to allege purposeful discrimination. This motion was denied on June 12, 1980 and this appeal followed.
 
 II.
 TIMELINESS OF THE TITLE VII FILING (COUNT II)
 
 69
 The timeliness issue is presented to us by two plaintiffs who are members of the class in the present action and individual plaintiffs in a consolidated companion case before this court.[2] Olivia Howard and Lynette Crawford are black women who took and failed the written portion of the Civil Service examination in 1975. As a result of their failure to pass the test their names were not placed on the eligibility roster. This list was to have a three year life during which no new applications would be accepted. The list was officially promulgated on May 3, 1975 and lasted into 1978.
 
 
 70
 The plaintiffs filed charges of discrimination with the EEOC on July 9, 1976, approximately 14 months after the list's publication. Newark hired from the list on only one occasion during the roster's three year life and that use occurred in November 1977. Thus, the plaintiffs filed beyond 180 days after the list's publication but prior to its first use.[3]
 
 
 71
 Plaintiffs advance two theories for why their otherwise late filing should be considered timely. They assert that the discriminatory test gave rise to a tainted civil service roster with a three year life. Thus, the discrimination inherent in the test results was embodied in the list for its life and constituted a continuing violation. Secondly, they argue that equitable considerations should have tolled the statutory filing period. While I agree with the majority's result in rejecting plaintiffs' tolling arguments, I am not persuaded by the majority's views on the continuing violation theory.
 
 
 72
 The majority opinion properly observes that this circuit and numerous other circuits have recognized the continuing violation theory in Title VII cases. Majority Opinion, at 1081-1082 citing cases and commentators. Nevertheless, on the authority of the Supreme Court's decisions in Delaware State College v. Ricks, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980) and United Air Lines v. Evans, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), the majority seems to be sounding the death knell of the continuing violation theory. Neither Ricks nor Evans involved a situation in which the plaintiffs alleged a discriminatory act and were then barred from reapplying for the same position over the life of a civil service roster.
 
 
 73
 In Evans, the plaintiff was a female flight attendant who alleged that she was discriminatorily dismissed from her job in 1968 by United Air Lines. She did not file charges with the EEOC until 1973, one year after she was rehired by the airline. The Supreme Court assumed that her 1968 dismissal was in violation of Title VII and asked whether the employer committed "a second violation of Title VII by refusing to credit her with seniority for any period prior to February 1972 (the day of her rehiring)." 431 U.S. at 554, 97 S.Ct. at 1887. Justice Stevens observed that the plaintiff was hired as a new employee in 1972 and stated:Respondent is correct in pointing out that the seniority system gives present effect to a past act of discrimination. But United was entitled to treat that past act as lawful after respondent failed to file a charge of discrimination within the 90 days then allowed by § 706(d). A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences.
 
 
 74
 Respondent emphasizes the fact that she has alleged a continuing violation. United's seniority system does indeed have a continuing impact on her pay and fringe benefits. But the emphasis should not be placed on mere continuity; the critical question is whether any present violation exists. She has not alleged that the system discriminates against former female employees or that it treats former employees who were discharged for a discriminatory reason any differently from former employees who resigned or were discharged for a non-discriminatory reason. In short, the system is neutral in its operation.
 
 
 75
 431 U.S. at 558, 97 S.Ct. at 1889 (footnote omitted). The Supreme Court concluded that the plaintiff having passed up the opportunity to file charges in 1968 could not reach the effects of the alleged discriminatory dismissal by filing five years later.
 
 
 76
 The majority misconstrues the gist of the plaintiffs' complaint in this case when it writes that they "complain of defendants' refusal to place them on the hiring roster." Majority Opinion, at 1083. The plaintiffs complain not only that the allegedly discriminatory test kept them off the hiring roster but that the statutorily prescribed life of the list precluded Newark from hiring minority candidates via a non-discriminatory process. If the discrimination did occur, it was not merely when the list was promulgated. Rather, it occurred then and continued to occur as long as the civil service policy and practice of hiring exclusively from the allegedly tainted list barred the plaintiffs from an equal opportunity to be hired.
 
 
 77
 Likewise, in Ricks, the Supreme Court was not considering an allegation that Delaware State College had established a discriminatory policy or practice anything akin to a civil service examination and an employment roster. There, a black Liberian faculty member was denied tenure on June 26, 1974, was given a one year terminal contract for the 1974-75 school year, and was terminated as an employee on June 30, 1975. As a court of appeals, we held that for reasons of policy "a terminated employee who is still working should not be required to consult a lawyer or file charges of discrimination against his employer so long as he is still working, even though he has been told of the employer's present intention to terminate him in the future." Ricks v. Delaware State College, 605 F.2d 710, 712 (3d Cir. 1979) quoting Bonham v. Dresser Industries, Inc., 569 F.2d 187, 192 (3d Cir. 1977), cert. denied, 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978). We believed that, in academia as in business, decisions are often changed and it would be unwise to encourage the initiation of litigation prior to the end of the employment relationship. The end of employment rule had the benefit of fostering amicable relations between employers and employees as well as providing "a bright line guide" for when the time period began to run. 605 F.2d at 712.
 
 
 78
 The Supreme Court, in a 5-4 decision, reversed the decision of our court. Justice Powell, writing for the majority, held that June 26, 1974, the date on which Ricks was offered a terminal contract, was a valid starting point for the limitations period. It was at this point that the College "had established its official position-and made that position apparent to Ricks...." 101 S.Ct. at 506.
 
 
 79
 Interestingly, the Court addressed Ricks continuing violation argument as follows:Determining the timeliness of Ricks' EEOC complaint, and this ensuing lawsuit, requires us to identify precisely the "unlawful employment practice" of which he complains. Ricks now insists that discrimination not only motivated the College in denying him tenure, but also in terminating his employment on June 30, 1975. Tr. of Oral Arg., at 25, 26, 31-32. In effect, he is claiming a "continuing violation" of the civil rights laws with the result that the limitations periods did not commence to run until his one-year "terminal" contract expired. This argument cannot be squared with the allegations of the complaint. Mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination. United Air Lines v. Evans, supra, 431 U.S., at 558, 97 S.Ct. at 1889. If Ricks intended to complain of a discriminatory discharge, he should have identified the alleged discriminatory acts that continued until, or occurred at the time of, the actual termination of his employment. But the complaint alleges no such facts.
 
 
 80
 Indeed, the contrary is true. It appears that termination of employment at Delaware State is a delayed, but inevitable, consequence of the denial of tenure. In order for the limitations periods to commence with the date of discharge, Ricks would have had to allege and prove that the manner in which his employment was terminated differed discriminatorily from the manner in which the College terminated other professors who also had been denied tenure. But no suggestion has been made that Ricks was treated differently from other unsuccessful tenure aspirants. Rather, in accord with the College's practice, Ricks was offered a one-year "terminal" contract, with explicit notice that his employment would end upon its expiration.
 
 
 81
 101 S.Ct. at 503-04 (footnote omitted). Contrary to the majority's view of Ricks in the present case, the Supreme Court did not reject the continuing violation theory, only its application to the pleaded facts before it.
 
 
 82
 In our case, the plaintiffs "have identified the alleged discriminatory acts that continued...." They have alleged discrimination not only in the use of the test initially to form a roster but in the continued bar to equal employment which such a list presents. The case presented by our facts is entirely different in its effect and implications from those facts presented to the Supreme Court in Ricks and Evans. It is, in effect, closer to a case where an employer posts a sign which reads "Whites Only." International Brotherhood of Teamsters v. United States, 431 U.S. 324, 365, 97 S.Ct. 1843, 1869, 52 L.Ed.2d 396 (1977). A discriminatory civil service test operates to humiliate and exclude not only those who take it and fail but also has the effect of discouraging future applicants during the roster's life and beyond. As the Supreme Court cogently observed in Teamsters :
 
 
 83
 The effects of and the injuries suffered from discriminatory employment practices are not always confined to those who were expressly denied a requested employment opportunity. A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection.
 
 
 84
 If an employer should announce his policy of discrimination by a sign reading "Whites Only" on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs.
 
 
 85
 Id. See Roberts v. North American Rockwell Corp., 650 F.2d 823, (6th Cir. 1981) ("We do not think that Title VII requires that suit be filed when the applicant is initially discriminated against. If an ongoing discriminatory policy is in effect, the violation of Title VII is ongoing as well." At 827).
 
 
 86
 The majority, relying entirely on Ricks and Evans which I believe are not controlling, flatly refuses to discuss those cases in which courts have applied the continuing violation theory to similar facts as presented here. Majority Opinion, at 1082. For example, the majority in a footnote considers Guardians Ass'n of New York City v. Civil Serv., 633 F.2d 232 (2d Cir. 1980) (petition for certiorari filed August 31, 1981) and concedes that it poses a similar issue to that presented by our case. They characterize the Second Circuit's decision as holding "that the repeated use of an eligibility roster, based on a discriminatory written examination, to make hiring decisions constitute(s) repeated violations of Title VII." Majority Opinion, at 1082, footnote 21. I do not think that Ricks in any way overrules the 1980 decision of the Second Circuit in Guardians Ass'n.
 
 
 87
 In Guardians Ass'n, the plaintiffs were black and Hispanic members of the New York City Police Department who were laid off pursuant to a "last-hired, first-fired" policy. They brought suit in 1976 challenging seven entry level written examinations administered between 1968 and 1970 and having effect into 1974. "Central to the attack on the system of layoff by seniority was the contention that the department's entry level examinations were discriminatory, and that but for this discrimination plaintiffs would have been hired earlier and thus would have accrued sufficient seniority to withstand being fired." 633 F.2d at 236 (footnote omitted). Since Title VII was not applicable to municipalities until 1972, the Second Circuit had to decide whether actions taken by New York City pre-1972 could form the basis of a Title VII lawsuit and whether EEOC charges filed in 1975 were timely.
 
 
 88
 The Second Circuit, per Judge Meskill, upheld the district court's affirmative answer to both questions. The circuit court's views were clearly elucidated in the following paragraph:
 
 
 89
 Defendants argue that "the claims of discriminatory refusal to hire presented here clearly depend upon 'a past event which has no present legal significance.' " Reply brief at 5, quoting United Air Lines, Inc. v. Evans, 431 U.S. 553, 560, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). Defendants wish, understandably, to accentuate their pre-Act conduct and trivialize their post-Act conduct, but logic and precedent preclude acceptance of defendants' assessment of the legal significance of their actions. We need not decide whether the giving of the tests and the compilation of the lists in themselves constituted the infliction of an actionable injury, for the results of the tests were in effect being "used to discriminate," in direct contravention of § 703(h) of Title VII, each time a member of the plaintiff class was denied a chance to fill a vacancy. By utilizing the tainted test results for years after becoming subject to the commands of Title VII, defendants continued a course of discriminatory conduct that had indeed begun before the effective date of the Act but did not cease until defendants abandoned the practice of making hiring decisions in this manner. Even if the unjustified refusals to hire did not comprise the core of defendants' discriminatory conduct, at the very least they represented the culmination of a continuously maintained illegal employment policy. Acha v. Beame, supra, 570 F.2d at 65. And it is settled law that the limitation period determining the timeliness of a complaint filed as to such a policy is measured from the last occurrence of an instance of that policy. Id.
 
 
 90
 633 F.2d at 249 (footnotes omitted) (emphasis added). Similarly, in the present case, the list was used to further an employment policy which the plaintiffs contend was based on a discriminatory examination. The manifestations of discrimination embodied in the test continue to occur over the entire life of the civil service list, i.e., qualified minorities who were injured by the test were then precluded from being hired by the existence of a tainted list.
 
 
 91
 The majority observes that our case is distinguishable from Guardians Ass'n, by virtue of the fact that here the plaintiffs filed with the EEOC prior to Newark's first hiring from the list. Majority Opinion, at 1083-1084. Because there was no post-use filing, as in Guardians Ass'n, the majority implicitly argues that a premature filing does not satisfy the requirements of Title VII. I believe that under the reasoning of Guardians Ass'n and the majority's own opinion, this conclusion is erroneous.
 
 
 92
 The Guardians Ass'n court by its own terms did not reach the issue of "whether the giving of the tests and the compilation of the lists in themselves constituted the infliction of an actionable injury...." 633 F.2d at 249 (footnote omitted). The majority opinion today reaches that question when it decides "... the roster, because it arises from examinations which have discriminatory impact, could constitute an unlawful employment practice." Majority Opinion, at 1083. If the plaintiffs could have filed within 180 days of the list's promulgation or within 180 days of its last use (Newark's first and only use of the roster was in 1977), then, in order for the word "continuing" to have any reasonable meaning, a filing between the first offense and the last offense would be timely as it came during the period of continuation. To hold otherwise would be to say that the violation runs for 180 days after the list is published and then it stops. After the next use the violation runs for another 180 days and then it also stops. In short, there would be no continuation at all. Rather, we would be saying nothing more than each discrete act of discrimination is followed by a 180 day limitation period. I think the more sensible approach is to say that the promulgation of a roster based on a discriminatory test gives rise to a cause of action under Title VII beginning at the list's publication and ending 180 days after its expiration. A filing at any time during this period would be timely irrespective of its relation to the test's use.[4]
 
 
 93
 Under the majority's view and that of the Guardians Ass'n court, if the list itself is not challenged within 180 days, the burden falls upon the victims of the discrimination to watch each municipality's hiring practices. Clearly, the municipality is in the best position to know when they will have a need to use the list, if at all. A plaintiff could avoid this disadvantage by filing at any period during the list's life. Furthermore, suppose a municipality employed a ten year civil service list based on a discriminatory examination. I cannot believe that Congress intended the very short limitation period in Title VII to be applied rigidly to cases where the employer could insulate the continuing discriminatory effect of its behavior for a period of years beyond the original discriminatory examination. The reality of the civil service list is that a victimized prospective employee cannot reapply for the position from which he or she has been unfairly kept. Finally, allowing a filing prior to the use of the list would obviate the necessity of plaintiffs, in cases such as the one before us, refiling with the EEOC when the defendants use the list as the defendants already have been fully apprised of the claims against them.
 
 
 94
 In summary, because I believe that Ricks and Evans have not disturbed the viability of the continuing violation theory and that a discriminatorily created roster constitutes a continuing violation over its entire life, I respectfully dissent from the majority's affirmance of the district court's conclusion that the Title VII charges were untimely filed.
 
 III.
 
 95
 SECTION 1981: DISPROPORTIONATE IMPACT OR INTENT? (COUNT I)
 
 
 96
 I concur fully with the majority's conclusion that this case must be remanded as to the Newark defendants under either the disproportionate impact theory or the higher intent standard. I also agree that the plaintiffs have not alleged sufficient facts to make out a prima facie case of intentional discrimination against the state defendants. I do not agree that § 1981 requires a showing of intent but I recognize, as does the majority, that this issue is controlled by our recent en banc decision in Croker.
 
 
 97
 The majority disposes of the § 1981 issue by a single reference to the Croker holding. Majority Opinion, at 1086-1087. They do not set forth any independent reasons for requiring intent in a § 1981 case choosing instead to rely on the reasoning advanced by the Croker majority. I write only to supplement the very fine dissenting opinions of Judges Aldisert and Gibbons, both of which I joined in the Croker case.
 
 
 98
 The Croker majority begins its analysis by examining the language of § 1981 and by comparing it to the language of the fourteenth amendment, interpreted by the Supreme Court in Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) to require a showing of intent. Chief Judge Seitz concluded as follows:
 
 
 99
 Section 1981 grants to all persons within the United States "the right ... to make and enforce contracts ... as is enjoyed by white citizens...." The language of the statute is inconclusive, but we believe that if it points in any direction, it suggests a requirement for proof of purposeful discrimination.... The guarantee of the "same right" to make contracts "as is enjoyed by white citizens" is similar to the guarantee of "equal protection" embodied in the fourteenth amendment, a standard that requires proof of intentional discrimination under Washington v. Davis. As long as both nonwhite and white employees are subject to the same employment requirements or restrictions, both may be said to have been granted the right to contract on equal terms.
 
 
 100
 Croker, at 986 (citations and footnotes omitted). The court also compared § 1981 to § 703(a)(2) of Title VII which the Supreme Court in Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) held to require only a showing of impact.
 
 
 101
 Next, the Croker majority looked to the legislative history of § 1981. The court recognized that § 1981 was first enacted under the thirteenth amendment and then reenacted under the fourteenth amendment to obviate any concern for the constitutionality of the Civil Rights Act of 1866. Croker, at 986-987. After reviewing the legislative history the court acknowledged
 
 
 102
 that the legislative history does not reveal a direct refusal to extend section 1981 to nonpurposeful conduct. Given the absence of a congressional declaration of intent to extend the 1866 Act to the effects of facially neutral conduct, however, we believe that it is more consistent with the language of and impetus behind the statute to conclude that the statute is directed only at purposeful conduct. We reach this conclusion fully aware that neither the language nor the legislative history provides certain guidance in interpreting section 1981.
 
 
 103
 Croker, at 988.
 
 
 104
 Finally, the Croker court discussed the policy considerations which led to its conclusion that proof of intent was a necessary element of a § 1981 action. Basically the court feared that an impact standard could be overly intrusive in the private and public sector if it led to suits striking down " 'a whole range of tax, welfare, public service, regulatory, and licensing statutes that may be more burdensome to the poor and to the average black than to the more affluent white.' " Croker, at 988, quoting Washington v. Davis, 426 U.S. at 248, 96 S.Ct. at 2051. Further, because Congress created an elaborate administrative procedure for employment dispute resolution in Title VII, the majority assumed "that Congress (did not intend) section 1981 to cover the same conduct." Croker, at 989.
 
 
 105
 I do not find any of the reasons stated by the Croker majority to be persuasive. At the outset, I recognize that virtually each circuit court which has considered this issue after Washington v. Davis has required a showing of intentional discrimination. On the other hand, the commentators have generally favored the lesser standard of disproportionate impact.[5] The Croker majority concluded that the legislative history of the Civil Rights Act of 1866 was "uncertain" as to whether the Act was intended to provide "protection from facially neutral actions having a discriminatory impact...." Croker, at 987. Yet in the very same paragraph they concede that the Civil Rights Act was in fact used to strike down facially neutral statutes contained in the infamous "Black Codes." Id. at 987. As Judge Gibbons wrote powerfully in his Croker dissent:
 
 
 106
 In this case we are not dealing with what the government would have to show in order to avoid a directed verdict under 18 U.S.C. § 242, the criminal code descendant of the 1866 Act. The Act contemplated private civil as well as criminal enforcement. Issues such as the form of action for such private cases, and the quantity of proof sufficient to make out a prima facie case were not dealt with, for the good and sufficient reason that those questions were dealt with in the Process Act, the Judiciary Act, and the Common law. The 1866 Congress expected that in filling in the interstices in civil litigation, the courts would do so mindful of the social purpose of the legislation. The majority ignores that purpose. Free to choose a rule with respect to the contents of a prima facie case of a Section 1981 violation, it chooses the one most likely to inhibit rather than advance that purpose.
 
 
 107
 Id. at 1007-1008 (footnotes omitted). When given an opportunity in Washington v. Davis to answer the question of which standard of proof to apply in a § 1981 case, the Supreme Court chose to restrict its holding to the fourteenth amendment claim and therefore declined, in the words of Judge Gibbons, to adopt a policy that would "inhibit rather than advance" the social justice inherent in the 1866 statutory policies.
 
 
 108
 A number of the cases requiring a showing of intent have tracked the Washington v. Davis analysis, as did the Croker case, and concluded that § 1981 claims should be held to the same standard as the fourteenth amendment. However, it is clear that:
 
 
 109
 Section 1981 derives from the Civil Rights Act of 1866 and from the reenactment of section 1 of that Act in sections 16 and 18 of the Act of May 31, 1870. Runyon v. McCrary, supra, 427 U.S. at 168-70 n. 8, 96 S.Ct. 2586, (at 2593-94 n. 8). Due to its unusual history, section 1981 can fairly be said to rest not only on the fourteenth amendment but also on the foundation provided by the thirteenth amendment. Id. at 189, 96 S.Ct. 2586, (at 2603) (Stevens, J., concurring). See also Tillman v. Wheaton-Haven Recreation Ass'n, 410 U.S. 431, 439-40 n. 11, 93 S.Ct. 1090, (1094-95 n. 11), 35 L.Ed.2d 403 (1973); Strauder v. West Virginia, 100 U.S. 303, 312, 25 L.Ed. 664 (1879); Young v. Int'l Tel. & Tel. Co., 438 F.2d 757, 759 (3d Cir. 1971). As we have previously noted, the legislative history of the Civil Rights Act of 1866 manifests Congress' purpose to enact sweeping legislation implementing the thirteenth amendment to abolish all the remaining badges and vestiges of the slavery system.
 
 
 110
 Mahone v. Waddle, 564 F.2d 1018, 1030 (3d Cir. 1977), cert. denied, 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978) (footnote omitted) (emphasis added) (applying § 1981 to allegations of police brutality against minority plaintiffs; no issue of intent presented).
 
 
 111
 I believe that the thirteenth amendment genesis of § 1981 makes the fourteenth amendment reasoning of Washington v. Davis inapplicable. Rather than strain to place § 1981 into the same analytical category as the fourteenth amendment, I would instead rely on the plain and broad remedial language of § 1981 and the purposes of the thirteenth amendment. Section 1981 provides:
 
 
 112
 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
 
 
 113
 The statute grants affirmative rights to "all persons within the jurisdiction of the United States...." The fourteenth amendment, on the other hand, is phrased in terms of a negative injunction, i.e., "no state shall make or enforce any law...." Section 1981 is directed to the recipient of the rights and does not indicate any concern for the subjective mentality of those who would deprive a citizen of his or her rights.
 
 
 114
 Moreover, the thirteenth amendment has been held to be a remedial amendment with powers broader than the ending of slavery. In Jones v. Alfred H. Mayer Co., 392 U.S. 409, 439-40, 88 S.Ct. 2186, 2203-04, 20 L.Ed.2d 1189 (1968), Justice Stewart quoting from the Civil Rights Cases of 1883 wrote:
 
 
 115
 Does the authority of Congress to enforce the Thirteenth Amendment "by appropriate legislation" include the power to eliminate all racial barriers to the acquisition of real and personal property? We think the answer to that question is plainly yes.
 
 
 116
 "By its own unaided force and effect," the Thirteenth Amendment "abolished slavery, and established universal freedom." Civil Rights Cases, 109 U.S. 3, 20, 3 S.Ct. 18, 27, 27 L.Ed. 835. Whether or not the Amendment itself did any more than that-a question not involved in this case-it is at least clear that the Enabling Clause of that Amendment empowered Congress to do much more. For that clause clothed "Congress with power to pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States." Ibid. (Emphasis added.)
 
 
 117
 Those who opposed passage of the Civil Rights Act of 1866 argued in effect that the Thirteenth Amendment merely authorized Congress to dissolve the legal bond by which the Negro slave was held to his master. Yet many had earlier opposed the Thirteenth Amendment on the very ground that it would give Congress virtually unlimited power to enact laws for the protection of Negroes in every State. And the majority leaders in Congress-who were, after all, the authors of the Thirteenth Amendment-had no doubt that its Enabling Clause contemplated the sort of positive legislation that was embodied in the 1866 Civil Rights Act.
 
 
 118
 392 U.S. at 439-40, 88 S.Ct. at 2203-04 (footnotes omitted).
 
 
 119
 Jones is frequently cited for the proposition that the Supreme Court will require intent in § 1981 cases because it has done so for cases arising under § 1982. The language of Jones that § 1982 "was meant to prohibit all racially motivated deprivations of the rights ..." is relied upon in deriving this conclusion. However, I am not convinced that this over-quoted language is at all conclusive on the issue of intent in a § 1981 case. In the first place, the Court was presented with a set of facts that left no question of intent. The plaintiff was refused an opportunity to purchase a home solely on the basis of his race. The Court was not presented with a factual situation whereby a facially neutral housing policy resulted in de facto discrimination. Secondly, the Court's emphasis on the word "all" indicates that it was addressing the distinction between state and private party discrimination. There is no indication in Jones that the Court meant to exclude suits under § 1982 where only disproportionate impact could be shown. Indeed in a later passage, where the Court sums up a discussion of the sweeping effect of the Civil Rights Act of 1866, the reference to motivation is completely deleted:
 
 
 120
 In light of the concerns that led Congress to adopt it and the contents of the debates that preceded its passage, it is clear that the Act was designed to do just what its terms suggest: to prohibit all racial discrimination, whether or not under color of law, with respect to the rights enumerated therein-including the right to purchase or lease property.
 
 
 121
 392 U.S. at 436, 88 S.Ct. at 2201 (emphasis added). I believe that it is a more persuasive indication of the Supreme Court's reasoning that the word motivated appears in connection with a discussion of the petitioners' argument (where intent is clearly established and not at issue) but deleted where the court addresses the 1866 Act at large.
 
 
 122
 The "badges and incidents of slavery" as well as the rights of all citizens, white and black alike, created by § 1981 are objective. The § 1981 rights do not derive their life from the nefarious intent of those who would deprive citizens of their thirteenth amendment and statutory entitlements, i.e., to be free from the incidents of slavery and to participate fully and freely in American society. I cannot believe that Congress would use such broad language as it did in § 1981, creating new rights for minority citizens, only to have the vindication of those rights denied by benign neglect or institutional forms of racism.
 
 
 123
 However persuasive Washington v. Davis may be in its analysis of the fourteenth amendment, its precedential value and usefulness in interpreting § 1981 is limited. It is noteworthy that the case itself recognized that the commands of employment discrimination statutes are not in any sense necessarily co-extensive with constitutional commands:
 
 
 124
 (E)xtension of the rule (of disparate impact) beyond those areas where it is already applicable by reason of statute, such as in the field of public employment, should await legislative prescription.
 
 
 125
 426 U.S. at 248, 96 S.Ct. at 2051 (emphasis added). Even more convincing that the Supreme Court views the dictates of the fourteenth amendment differently from those of "legislative prescription" in the area of civil rights, is the recent case of Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). There, at least five members of the Court adopted the view that,
 
 
 126
 Nothing in the language of (42 U.S.C.) § 1983 or its legislative history limits the statute to intentional deprivations of constitutional rights. In Baker v. McCollan, (443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) ), we suggested that simply because a wrong was negligently as opposed to intentionally committed did not foreclose the possibility that such action could be brought under § 1983.
 
 
 127
 101 S.Ct. at 1912.
 
 
 128
 Interpreting the language of the Constitution, the Court held in Washington v. Davis that "(t)he central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct (intentionally) discriminating on the basis of race." 426 U.S. at 239, 96 S.Ct. at 2047. Yet Parratt v. Taylor, which construed the language of § 1983-"every person who ... subjects or causes to be subjected ... any citizen ... to the deprivation of any rights ..."-held that § 1983, which was indisputably enacted under the fourteenth amendment's grant of legislative authority, does not require proof of intentional deprivations.
 
 
 129
 In my view Washington v. Davis is totally inapplicable in the § 1981 context. The thirteenth amendment's concern for the elimination of the badges and incidents of slavery is an objective impact standard completely apart from the subjective intent based considerations of the fourteenth amendment. Even assuming that § 1981's repassage under the fourteenth amendment in 1870 makes a fourteenth amendment analysis relevant, the Washington v. Davis and Parratt v. Taylor decisions make clear that the constitutional analysis is not to be rigidly carried over into the area of civil rights statutes.
 
 
 130
 Likewise, I am not convinced that, because the Supreme Court in Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), decided impact suffices in the Title VII context, it is inconsistent to have two remedial statutes operating in the same area with the same standard of proof. In fact, Judge Aldisert's dissenting argument in Croker assumed "that in enacting Title VII Congress also recognized the circumstances where the two remedies are congruent." At 1001. Judge Aldisert reasoned wisely that,there will be more predictability and reckonability to the law of employment discrimination, more understanding and societal acceptability by the lay public, including putative employees, employees, and employers alike, if there is consistency in the judicial interpretation of the two statutes. The interested lay public will not be able to understand that where a claim of discrimination antedates the limitation period of Title VII the employee must prove discriminatory intent for years one and two, but need only prove discriminatory impact for years three and four.
 
 
 131
 Croker, at 1002. Since the reach of § 1981 is greater than that of Title VII, to sweep away the broad remedial powers of § 1981 by requiring intent in areas not covered by Title VII[6] or, in employment cases, where discrimination is insulated from a Title VII challenge by a six month statute of limitations, is an injustice too great for our court to attribute to the unarticulated intent of Congress. Croker, at 989.
 
 
 132
 Finally, relying on policy considerations to support its conclusion, the Croker majority wrote:
 
 
 133
 In rejecting a discriminatory impact standard for fourteenth amendment claims, the Supreme Court noted that such a standard might "invalidate a whole range of tax, welfare, public service, regulatory, and licensing statutes that may be more burdensome to the poor and to the average black than to the more affluent white." Washington v. Davis, 426 U.S. at 248, 96 S.Ct. at 2051. Applying an impact standard to section 1981 raises similar concerns. In significant measure, an impact standard would have the very consequences that the Supreme Court sought to avoid in Washington v. Davis. In fact, because section 1981, unlike the fourteenth amendment, covers not only governmental but also private conduct, an impact standard applied to section 1981 could be more intrusive than would one applied to the fourteenth amendment. See Heiser, supra, at 245-46. We do not address whether Congress could pass legislation under the thirteenth amendment requiring proof of impact only. Without, however, a clear indication that Congress intended section 1981 to reach nonpurposeful conduct or neutral regulations having a disproportionate impact, we are reluctant to ignore the concerns voiced in Washington v. Davis.
 
 
 134
 At 988-989. The fear that a civil rights statute will be used to strike down "a whole range of tax, welfare, public service, regulatory and licensing statutes," which impact unequally on the poor and on minorities does not concern me. First, if the plaintiffs can prove disproportionate impact and the public service statute is without a rational basis then why should it not fall? Second, the Supreme Court and courts of appeals have had much experience in deciding where to draw lines on a case-by-case basis. The Croker court has abandoned this time honored judicial role by giving way to a hollow fear that § 1981 "could be more intrusive: therefore it should be limited to intentional discrimination." Refusing to adopt a standard designed to completely root out inequality because to do so would be intrusive is like a dentist drilling out half of the decay in a rotted tooth and leaving the rest so as not to be intrusive.
 
 
 135
 In my view all of the public policy considerations weigh heavily in favor of an impact standard. As Judge Aldisert observed the public will be confused by two separate standards of proof in the same case. The difficulty of proving intent will leave many victims of discrimination frustrated when the clear purpose of § 1981 is to foster equality among the races. Finally, our law will be left with the striking anomaly that corporations and private parties can be held liable without regard to mental state in a number of civil and criminal contexts but not in the vital area of equal access to jobs. Simply stated, the cost of allowing inequality to go unremedied is far in excess of the benefit derived from allowing even well-intentioned employers an escape from their duty to eradicate institutional bias.
 
 
 
 [1]
 Count I also included allegations based on 42 U.S.C. § 1983 and the Thirteenth and Fourteenth Amendments. Summary judgment in favor of defendants was granted on these other claims also. Plaintiffs do not raise these claims on appeal
 
 
 [2]
 See judgment of April 29, 1980 (A 259) in accordance with Bronze Shields v. New Jersey Dept. of Civil Serv., 488 F.Supp. 723 (D.N.J.1980). On May 7, 1980, plaintiffs moved, pursuant to F.R.Civ.P. 59(a), to vacate the above judgment and to amend the complaint to include a new paragraph 42A as follows:
 "The defendants have engaged in the aforesaid actions with the purpose and effect of depriving the members of the plaintiff class of equal employment opportunity because of their race or national origin."
 (A 261)
 This motion was denied by order filed June 12, 1980 (A 262).
 
 
 [3]
 The court's dismissal of the Title VII cause of action followed its decision to deny plaintiffs' motion for certification of a class. It is in the court's opinion denying class certification, filed February 23, 1979, that the court concluded the EEOC charges had not been timely filed. The order dismissing count II was entered on April 2, 1979
 We note that Judge Meanor's opinion of February 23, 1979, at note 1 (130A) refers to a pending pattern or practice suit brought by the Government. See United States v. State of New Jersey, et al. (D.N.J., Civil No. 79-184), under which broad relief would apparently be available to persons in the plaintiffs' class qualifying under Title VII. See Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).
 
 
 [4]
 This is a simplified explanation of the requirements set out in N.J.Admin.C. tit. 4:1-8.1 et seq
 
 
 [5]
 Veterans, however, are placed at the top of the list as they have an absolute preference. N.J.Admin.C. tit. 4:1-11.2
 
 
 [6]
 This injunction was issued on the then well-founded belief that constitutional claims of racial discrimination in employment do not require a showing of discriminatory intent. Prior to the Supreme Court's decision in Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), this Court of Appeals, like most others, held that a claim under § 1981, like one under Title VII, required only a showing of discriminatory impact, and not discriminatory intent. Erie Human Relations Comm'n v. Tullio, 493 F.2d 371, 373 n.4 (3d Cir. 1974). The Court in Washington admittedly rejected the generally accepted rule when it held that a showing of discriminatory intent was required for all constitutionally based claims of discrimination. Washington v. Davis, supra 426 U.S., at 244-45, 96 S.Ct. at 2049-50
 
 
 [7]
 As the district court correctly noted, unless plaintiffs have a cause of action in their own right, they cannot be certified as representatives of a class. Sosna v. Iowa, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975)
 
 
 [8]
 The count I claims had already been dismissed against the New Jersey Department of Civil Service and the New Jersey Civil Service Commission. Certain individual defendants had been substituted. See note 2 of the district court's opinion at 488 F.Supp. 723, 725 (D.N.J.1980)
 
 
 [9]
 The district court's opinion addresses only the § 1981 claim but does dispose of the § 1983 and Fourteenth Amendment claims in a footnote. 488 F.Supp. 723, 731 n.18. No mention of the Thirteenth Amendment claim was made, but we assume, because it is not contested on appeal, that this claim was implicitly disposed of in the summary judgment order
 
 
 [10]
 None of the plaintiffs took and failed the examination for promotion (A 146)
 
 
 [11]
 Plaintiffs claim on appeal that the use of the eligibility rosters for promotion presents a continuing violation. Because plaintiffs do not have standing to assert the claim, however, we need not consider this issue
 
 
 [12]
 Plaintiffs are without standing because none of the plaintiffs who filed charges with the EEOC were adversely affected by the screening. Plaintiffs Olivia Howard and Crawford took and failed the civil service examination so never reached the screening stage. The remaining plaintiffs who filed charges with the EEOC all survived the screening process and were hired as Newark police officers
 
 
 [13]
 Title VII § 706(e), 42 U.S.C. § 2000e-5(e) provides:
 "A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter, except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency."
 
 
 [14]
 The 180-day limit applies because all the plaintiffs initially filed charges with the EEOC. A 300-day filing period would have applied had plaintiffs initially filed with the state agency. 42 U.S.C. § 2000e-5(e)
 
 
 [15]
 The district court issued two unpublished opinions on the Title VII cause of action. The first opinion discusses continuing violations (A 129, et seq.), the second deals with equitable estoppel (A 154, et seq.)
 
 
 [16]
 Below are listed just a few of the more recent law review commentaries on the continuing violation theory. The Continuing Violation Theory, 31 Hastings L. J. 929 (1980); Jackson and Matheson, The Continuing Violation Theory and the Concept of Jurisdiction in Title VII Suits, 67 Geo. L. J. 811 (1979); Title VII and the Continuing Violation Theory: A Return to Congressional Intent, 47 Fordham L.Rev. 894 (1979); Note: Continuing Violations of Title VII: A Suggested Approach, 63 Minn.L.Rev. 119 (1978)
 
 
 [17]
 Bethel v. Jendoco Const. Corp., 570 F.2d 1168 (3d Cir. 1978); Wetzel v. Liberty Mutual Insurance Co., 508 F.2d 239 (3d Cir.), cert. denied, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); Guardians Ass'n of New York City v. Civil Serv., 633 F.2d 232 (2d Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981); Acha v. Beame, 570 F.2d 57 (2d Cir. 1978); Clark v. Olinkraft Inc., 556 F.2d 1219 (5th Cir. 1977); Cedeck v. Hamiltonian Federal Savings & Loan Ass'n, 551 F.2d 1136 (8th Cir. 1977); Rich v. Martin Marietta Corp., 522 F.2d 333 (10th Cir. 1975); Macklin v. Spector Freight Systems, Inc., 478 F.2d 979 (D.C.Cir.1973); Cox v. United States Gypsum Co., 409 F.2d 289 (7th Cir. 1969)
 
 
 [18]
 Hart v. J. T. Baker Chemical Corp., 598 F.2d 829, 831 (3d Cir. 1979); Baker v. Stuart Broadcasting Co., 560 F.2d 389, 391 (8th Cir. 1977). 29 C.F.R. § 1601.34 (1980) provides that the "rules and regulations shall be liberally construed to effectuate the purpose and provisions of Title VII."
 
 
 [19]
 Love v. Pullman Co., 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972); Smith v. American President Lines, Ltd., 571 F.2d 102, 105 (2d Cir. 1978)
 
 
 [20]
 See cases cited in note 17, supra
 
 
 [21]
 For example, the recent Second Circuit case of Guardians Ass'n of New York City v. Civil Serv., 633 F.2d 232 (2d Cir. 1980), petition for cert. filed, 50 U.S.L.W. 3157 (Nos. 81-431, 81-432, Aug. 31, 1981), involved an issue similar to the one presented here. That court held that the repeated use of an eligibility roster, based on a discriminatory written examination, to make hiring decisions constituted repeated violations of Title VII. We have considered carefully the January 20, 1981, letter from plaintiffs' counsel and cannot agree with the contention at page 3 that "Ricks does not protect the defendants in this case from judicial correction of their wrongful practice."
 The dissent incorrectly contends at typescript page 9 that this decision "flatly refuses to discuss" the cases of other circuit courts of appeals, such as Guardian Ass'n of New York City v. Civil Serv., supra, on which the dissent relies, even though the first 12 lines of this footnote and 13 lines of note 23 below refer to facts which distinguish that case from this record and point out places in this record where counsel for appellants' arguments based on that case are enumerated. That case is also cited in the discussion of the continuing violation theory at typescript page 12. See note 17 above and text related to that note. Essentially, our difference with the dissent centers on the effect which Ricks has on Guardian and similar cases.
 
 
 [22]
 Plaintiffs received actual notice of their failure in February 1975
 
 
 [23]
 The eligibility roster was published in May 1975; plaintiffs filed with the EEOC in July 1976; and Newark's first and only use of the allegedly offending roster was in November 1977. Under the Second Circuit's holding in Guardians Ass'n of New York v. Civil Service, 633 F.2d 232 (2d Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981), had Newark used the list and hired recruits within 180 days before plaintiffs filed, their filings would have been timely. This is not the situation here. Newark did not hire any police officers from the roster prior to plaintiffs' filing of their EEOC charges. Hence, even if we followed the theory of the Guardians case, there would have been no compliance with the requirement of filing within 180 days after the discrimination had occurred. In Firefighters Institute for Racial Equality v. City of St. Louis, 588 F.2d 235 (8th Cir. 1978), cert. denied, 443 U.S. 904, 99 S.Ct. 3096, 61 L.Ed.2d 872 (1979), the court held that although no promotions were granted or denied, the use of a testing device to make up a promotion list was a discriminatory act which established liability
 
 
 [24]
 See note 13 and text incident to that note
 
 
 [25]
 Plaintiffs implicitly admit that Evans did not clearly change the law of continuing violation. Their argument is premised on the condition that only if we read Evans as making their filings untimely did Evans change the law. While Evans narrowed the scope of the continuing violation theory, we do not interpret it, nor has any other court interpreted it, as extinguishing the continuing violation theory completely
 
 
 [26]
 See the law review commentaries cited in note 16, supra
 
 
 [27]
 Plaintiffs' Opening Brief at 17
 
 
 [28]
 The litigation to which this refers is count I of the complaint in this case, filed in 1972
 
 
 [29]
 Plaintiffs' complaint reads in part:
 "34. On information and belief, defendant Redden and his agents and employees have discriminated against applicants in that the background investigation and interviews conducted by them exclude a disproportionate number of Black and Hispanic applicants in the following manner:
 c) the investigators and the appointing authority generally have wide discretionary powers which are exercised arbitrarily and without regard to ascertainable standards.
 d) the form required to be filled out by applicants inquires into matters irrelevant to the question of the fitness of the person to be a patrolman.
 "35. The psychiatric examinations administered by defendant Redden, his agents and employees are not validated as job related, are culturally and ethnically biased, and, on information and belief, are administered in a discriminatory manner so as to exclude disproportionate numbers of black and Hispanic applicants."
 
 
 [30]
 We note that a similar arbitrary discretion is allegedly involved in the determination of the service rating, a factor involved in compiling the roster used for promotion of police officers. Plaintiffs' Complaint, PP 36 and 38 at A 23-24. No plaintiff complains that he was given an undeservedly low rating or that the rating given affected his opportunity for promotion. The only plaintiffs concerned with the promotion roster were not placed on the roster because they either did not pass the written examination or did not fulfill the years-in-service requirement. Plaintiff Bronze Shield may have members who were adversely affected but it made no allegations on this point. Plaintiffs are without standing to challenge the use of the service rating
 
 
 [1]
 The written examination was given 11 times between May 8, 1972 and June 21, 1975. For the eight tests given between May 1972 and July 1974, in which we have raw figures of the number of persons taking the exam and disclosing their race voluntarily, the following patterns emerge: White males-total number 7184, number passing 4152, % passing 57.8; Black Males-total number 859, number passing 229, % passing 26.7; and, Hispanic Males-total number 318, number passing 84, % passing 26.4
 
 
 [2]
 These two black, female applicants were named plaintiffs in the amended Count II. They attempted to allege sex discrimination as well as race discrimination in the amended complaint. Their motion to add the sex discrimination claim to Count II by amendment was denied and has proceeded in the separate case of Howard v. New Jersey Department of Civil Service, 667 F.2d 1099
 
 
 [3]
 Had the plaintiffs filed first with a state equal employment commission the time limit would have been extended to 300 days. 42 U.S.C. § 2000e-5(e). Since they did not, the 180 day limit is applicable. At any rate, the plaintiffs exceeded both time periods
 
 
 [4]
 The use of the list would be relevant to the issue of damages only. Therefore, a charge filed prior to any use of the list would be timely but the plaintiffs would have no damages other than the list's dissolution until they were discriminatorily refused hire by the employer's use of the list in hiring a different person. This approach is consistent with the majority's starting of the clock at the promulgation of the list
 
 
 [5]
 See, e.g., Developments in the Law-Section 1981, 15 Harv. C.R.-C.L.L. Rev. 29 (1980); Section 1981: Discriminatory Purpose or Disproportionate Impact? 80 Colum.L.Rev. 137 (1980); Racially Disproportionate Impact of Facially Neutral Practices-What Approach Under 42 U.S.C. Sections 1981 and 1982? 1977 Duke L.Jour. 1267. While on the district court, I reached the issue of the proper standard to be applied in a § 1981 case holding that disproportionate impact satisfied the statute. Commonwealth of Pennsylvania v. Local Union 542, 469 F.Supp. 329, 400 (E.D.Pa.1978)
 
 
 [6]
 Title VII is limited to the employment context, whereas § 1981 applies to virtually every area of right and responsibility. Also, Title VII includes within it a six-month statute of limitations. 42 U.S.C. § 2000e-5(e). Section 1981 takes its statute of limitations from the nearest equivalent state statute. In Croker, the Pennsylvania statute was six years as it is for New Jersey in the present case