**VULCAN PIONEERS, INC., et al., Plaintiffs,**

v.

**NEW JERSEY DEPARTMENT OF CIVIL SERVICE, et al., Defendants.**

**UNITED STATES of America, Plaintiff,**

v.

**STATE of NEW JERSEY, et al., Defendants.**

**UNITED STATES of America, Plaintiff,**

v.

**STATE of NEW JERSEY, et al., Defendants.**

**VULCAN PIONEERS OF NEW JERSEY, et al., Plaintiffs,**

v.

**CITY OF NEWARK, et al., Defendants.**

**Civ. Nos. 950–73, 77–2054 and 79–184.**

United States District Court,
D. New Jersey.

May 3, 1984.

Vickie Donaldson, East Orange, N.J., for Vulcan Pioneers, Inc.

Michael L. Prigoff, Lebson & Prigoff, Englewood, N.J., for N.J. Firemen's Benev. Assoc.

Gerald F. George, U.S. Dept. of Justice, Employment Litigation Section, Washington, D.C., for U.S.A.

David I. Fox, Fox & Fox, Newark, N.J., for Newark Firemen's Benev. Assoc.

Matthew Powals, Atlantic City, N.J., for Atlantic City.

Joseph A. Pojanowski, III, Passaic, N.J., for City of Passaic.

John Kennedy, Corp. Counsel, Jersey City, N.J., for Jersey City.

Ralph L. Del Luccia, Jr., Paterson, N.J., for City of Paterson.

Harold L. Hamlette, Plainfield, N.J., for City of Plainfield.

John C. Pidgeon, First Asst. Corp. Counsel, Newark, N.J., for City of Newark.

N. Thomas Foster, Camden, N.J., for City of Camden.

Mark Fleming, Deputy Atty. Gen., Trenton, N.J., for State of N.J.

James Cahill, New Brunswick, N.J., for City of New Brunswick.

William H. Eaton, East Orange, N.J., for City of East Orange.

Frank P. Trocino, Elizabeth, N.J., for City of Elizabeth.

Lawrence Florio, Hoboken, N.J., for City of Hoboken.

George T. Dougherty, Trenton, N.J., for City of Trenton.

SAROKIN, District Judge.

This matter presents to the court one of the most difficult and troubling issues facing the judiciary today. Either by court order or consent decree, minorities have been hired as police officers and firefighters in major cities throughout the country. The clear purpose of such orders was and is to affirmatively correct the imbalances which have resulted from a history of discriminatory practices in the hiring and promotion of minorities.

Many of these orders, including the one here at issue, do not provide for the specific procedures to be followed in the event of layoffs. If the dictates of seniority are to govern, then minorities, being the most recently hired, will be laid off and the goals of affirmative action undermined. If, on the other hand, an attempt is made to protect such minority hires, then persons with greater seniority will be compelled to forfeit positions guaranteed by contract and statute. It is the tension between these two alternatives which renders the resolution of this problem so difficult.

The court, however, is convinced that adherence to strict contractual and statutory seniority requirements in determining who shall go and who shall stay cannot be permitted. The affirmative action plan embodied in the consent decree between the parties and the hirings pursuant thereto would be substantially eradicated thereby. The gains contemplated and those achieved

would be lost. Furthermore, a municipality or the state would be able to avoid the effect of such an order or decree merely by withholding the funds necessary to effectuate it. This type of unilateral action should not be permitted to thwart a judicial order or to justify the breach of a consent decree.

Affirmative action plans arose out of the recognition that this nation had oppressed its minority citizens, either purposefully or through the operation of more subtle social and economic forces. These plans seek more than to remove the nation's heel from the backs of minorities, but to reach down and to lift up those persons who have been deprived and discriminated against for centuries. The plans recognize the insufficiency of merely removing existing barriers. Affirmative action is necessary in order that historical imbalances and inequities not be prolonged well into the future.

Having recognized that obligation and acted upon it, are we to undo it in the face of economic reductions? Indeed, in hard economic times, it has always been the minorities who have suffered the most. It would be a dreadful step backwards to permit mass layoffs of minorities in light of the progress so recently achieved and so long in coming.

Changes in administration, changes in the composition of the Civil Rights Commission, indeed, changes in the government's position in this very litigation, should not alter the fundamental principles here involved. We cannot and should not retreat from our commitment to right the wrongs of the past. To permit layoffs based solely on seniority denies these principles and mocks the ideals of justice and equality which are the foundation of our Constitution and of the Civil Rights Acts.

By virtue of this determination, certain firefighters and police officers with greater seniority will be required to forfeit their positions. Were it not for the consent decree, these firefighters and police officers would be entitled to retain their positions under existing collective bargaining agreements and New Jersey civil service law. Though not themselves the perpetrators of the wrongs inflicted upon minorities over the years, these senior firefighters are being singled out to suffer the consequences. In effect, they are being required to hand over their jobs and paychecks to someone else. It is inconceivable that they can be asked to do this in the name of the public good, and yet not have the public assume the responsibility therefor. If we need to raze buildings to make way for a highway, to acquire land for a school or to obtain food to feed the poor, we do not simply take it from those who have it. What is involved in such cases is a taking of private property, and the Constitution requires that just compensation be paid.

Such a taking also occurs when the federal government, pursuant to civil rights legislation brings a lawsuit to enforce those laws and enters into a consent decree which adversely affects the contractual and statutory rights of private individuals. In such a situation, it is the federal government which must assume the resulting liability. It would be senseless to impose such liability upon the municipalities involved. Layoffs made in good faith, for economic reasons, may not be prohibited, for to do so would deny cities the right to reduce expenses. Moreover, if these municipalities could afford to pay just compensation, then they could afford to retain the workers. Requiring cities to pay persons whom they laid off because they could not afford to keep them would be ludicrous.

The court is therefore satisfied that the federal government must compensate senior firefighters laid off as a result of the application of the consent decree. The compensation to be paid is outlined below. However, the court recognizes that such compensation is small consolation to those who will nonetheless lose their jobs. Displaced senior firefighters and their families may well ask, "Why us?"

No truly satisfactory answer exists. Their perception of the unfairness visited upon them cannot be dissipated by a discussion of principle or of broad social goals. They cannot be expected to understand why they should pay for what others have

wrought or why they should be singled out and forced to make an involuntary contribution to a cause not their own, no matter how worthy that cause may be.

If the analogy to taking for highway purposes is apt, then those whose homes are taken probably pose the same question. Compensation is not adequate reparation for the personal displacement and upset, and the need for a public corridor does not allay their personal loss. Affirmative action is also a highway of sorts. It provides an avenue of hope, a road to equality. However, to ignore the grief and anger of those who fall in its path is to be blind to a poignant reality of our times. One can only hope that those called upon to make the sacrifice will not permit it to escalate the very prejudice which it seeks to undo. They must recognize that affirmative action is likewise small compensation for those who are descendants of slavery and have continued to be the victims of insidious bondage for generations since its abolition.

FACTS

The early procedural history of this matter is traced in detail in the court's opinion in *Vulcan Pioneers, Inc. v. New Jersey Department of Civil Service*, Civil Action No. 81–281, unpub.op. at 2–5 (D.N.J. October 1, 1982). The matter now before the court arises out of a suit filed by the United States on October 4, 1977. That suit charged that the New Jersey Department of Civil Service and twelve large cities in the state had discriminated against minorities in the hiring and promotion of firefighters. Originally consolidated with a class action brought on behalf of certain individuals who had applied for a position or a promotion in the Newark Fire Department, only the Justice Department action survived the court's February 23, 1979 decision dismissing certain individual plaintiffs who, the court held, had failed to timely file a complaint with the EEOC prior to suit and failed to allege intentional discrimination. *See Hood v. New Jersey Department of Civil Service*, 680 F.2d 955 (3d Cir.1982) (affirming the decision of the

district court). *See also Bronze Shields, Inc. v. New Jersey Department of Civil Service*, 667 F.2d 1074 (3d Cir.1981) (hiring and promotion of police officers). On May 30, 1980, the parties to the remaining action entered into a Consent Decree which was approved by the court. The Decree notes that defendants denied the existence of the discrimination alleged but provides for an affirmative action plan "to increase substantially the proportion of black and Hispanic personnel on [defendant's] respective fire departments." ¶ 3. Interim hiring goals ranging from 33% minority, in Elizabeth, to 60% minority in Newark and East Orange, were established, ¶ 3(a)–(d), pending the results of a new validity study and, consequently, a new examination in compliance with the *Uniform Guidelines of Employee Selection Procedures*, 28 CFR § 50.14 ¶¶ 4, 7(a). Recruitment and training programs were to be developed, ¶ 5(a), and various reporting and record-keeping requirements were set forth, ¶¶ 5(b), 6, 7(c), 9, 10, 11. Existing state laws respecting, for example, minimum qualifying standards, ¶ 4(a), veterans preference requirements, ¶ 4(b), residency preference requirements, ¶ 4(c) and probationary periods, ¶ 4(d), were to remain in effect. Provision was made for the involvement of the court in the event of a dispute, ¶¶ 6, 8, 11, and the court retained jurisdiction of all the matters covered. ¶ 12. The Consent Decree did not, however, specifically discuss layoffs.

That omission became relevant when, in the midst of a fiscal crisis, the City of Newark proposed to lay off 76 firefighters, of whom 46, or 60%, were to be minorities. On December 30, 1983, Vulcan Pioneers, an organization of black and Hispanic firefighters employed by the Newark Fire Department and Frederick Shackleford, one such firefighter, obtained an order to show cause why such layoffs should not be restrained. On January 3 and 4, 1984, counsel for these minority firefighters appeared and argued for such restraints. Their application was opposed by counsel for the State, for the City of Newark and for the Newark Firemen's Benevolent Association

(FMBA). By Bench Opinion dated January 4, 1984 and Order signed the following day, the court granted the application for a temporary restraining order. It also restrained any and all dismissals of nonminority, senior firefighters, and ordered the City of Newark, the State and the federal government to appear on January 16, 1984 and show cause "(1) why the City of Newark and/or State of New Jersey should not be ordered and directed to appropriate the necessary monies so as to retain the services of ... minority firefighters; and (2) why the United States should not be required to compensate any senior firefighters who may be laid off in order to retain the employment of the minority firefighters pursuant to the Consent Decree ...."

The City, the State and the federal government, and the Newark FMBA filed briefs in opposition to the injunctive relief posed by the court. Additionally, the City and State moved to dissolve the temporary restraints then in effect, which the court did, in light of an emergency appropriation passed by the State Legislature providing the funds necessary for Newark to avoid the proposed layoffs. Finally, the City sought to avoid recurrence of this problem and therefore moved for an order "[d]etermining and establishing the procedure to be utilized in any future layoffs to comply with [the] consent decree." In light of this motion, on January 16, 1984, the court ordered the parties to this action to meet and attempt to modify, by agreement, the Consent Decree in order to resolve the issues raised by the layoff problem. After hearing argument, however, and in light of the position taken by the United States ruling out an agreement basing layoffs on any factors other than seniority, the court reconsidered this order and wrote, in a letter dated January 18, 1984:

> ... in the interests of a speedy resolution of this problem and of avoiding the need to move hastily should fiscal problems again arise, the parties are directed to file briefs on or before March 1, 1984, addressing the following issues:
> 1. Should minority persons be retained in the face of layoffs in preference to persons with seniority?
> 2. If the order directs that some minorities be retained, upon what basis should that decision be made? Set forth a plan or formula to be utilized.
> 3. In the event it becomes necessary to lay off persons with seniority, should they be compensated and, if so, by whom?

A postponement until March 15, 1984 was granted and reasonable extensions allowed where necessary. As of this writing, the court has received briefs from the United States, the State of New Jersey, 10 of the 12 affected municipalities, the State FMBA, and City of Newark Local FMBA, and the Vulcan Pioneers. Only the municipalities of Camden and Plainfield,[1] and to a certain extent, Trenton, join the Vulcan Pioneers in proposing a layoff scheme based other than entirely on seniority. All the other responding cities, as well as the United States, the State and the unions, argue that seniority alone should govern any and all layoffs. Only the City of Camden and the Newark FMBA argue that compensation is called for. The United States, the Cities of East Orange, Paterson and Plainfield, the Vulcan Pioneers, and the New Jersey FMBA find no authority for the grant of any such compensation, while the State and the remaining cities argue simply that if compensation is to be paid, some other entity must assume that liability. The Cities of Atlantic City and Hoboken, although signatories to the decree, did not respond.

DISCUSSION OF THE LAW

A. *Layoffs*

The court has determined, as discussed above, that layoffs should and must be accomplished in a manner that does not undermine the purpose or effect of the affirmative action plan embodied by the

---

**1.** Only Plainfield states that it bases its position on the will of an elected governing body, in that case the City Council.

Consent Decree. The parties opposing this course of action base their arguments on grounds both procedural and substantive. These two sets of arguments are addressed below, *seriatim.*

## 1. *Modification of the Consent Decree*

 There is no question but that the court may exercise its equitable, discretionary powers to modify a consent decree in order to assure the vitality of such a decree approved by it. *See, e.g., United States v. United Shoe Corp.,* 391 U.S. 244, 251, 88 S.Ct. 1496, 1501, 20 L.Ed.2d 562 (1968); *United States v. Swift & Co.,* 286 U.S. 106, 114–15, 52 S.Ct. 460, 462–63, 76 L.Ed. 999 (1932). Hence, where changed circumstances serve to "thwart the basic purpose of the original consent decree," *Chrysler Corporation v. United States,* 316 U.S. 556, 562, 62 S.Ct. 1146, 1150, 86 L.Ed. 1668 (1942), citing *United States v. Swift & Co., supra; see also System Federation No. 91 v. Wright,* 364 U.S. 642, 647–48, 81 S.Ct. 368, 371–72, 5 L.Ed.2d 349 (1961), or where silence in its terms serves to prevent it from achieving its full purpose, *United States v. United Shoe Corp., supra,* 391 U.S. at 251, 88 S.Ct. at 1501, modification is entirely appropriate. Indeed, it is necessary.

That is precisely the situation here. Acting pursuant to the motion of defendant City of Newark, the court here exercises jurisdiction specifically retained by it to address a situation unforeseen at the time of the Consent Decree, and one which, as several parties recognize, would serve to render that decree meaningless. The layoffs here at issue, based as they are on deep economic recession and federal budget cuts not in the contemplation of the drafters of the Decree, were not specifically provided for in the agreement. The changed circumstances and the Decree's silence now combine to require that the resulting void be filled. The court's reaction is a response to this need and is completely justified by the caselaw.

 In so modifying the Decree, the court is aware that it must construe it "basically as a contract." *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975). Hence, it is bound to stay "within its four corners" and not to interpret it to the unattained advantage of any one party. *United States v. Armour & Co.,* 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971). In this case, these principles support the retention of minority firefighters hired as a result of the Decree. The Decree states, in paragraph 1:

> The defendants are compelled by law and by entering into this Order acknowledge their obligation to and agree they shall, refrain from engaging in any act or practice which has the purpose or effect of unlawfully discriminating against any black or Hispanic employee, or any black or Hispanic applicant or potential applicant for employment with their respective fire departments because of such individual's race, color, or national origin.

Focusing on effect, the Decree thus recognizes the need to take concrete steps to increase the numbers of minority firefighters:

> The defendants recognize that the proportion of black and Hispanic firefighting personnel on the respective municipal fire departments of the defendant cities is below the representation of blacks and Hispanics in the labor force of said municipalities and they also recognize the need to undertake affirmative action to increase substantially the proportion of black and Hispanic personnel on their respective fire departments.

Consent Decree ¶ 3. To thus allow economic recession, or fiscal parsimony, to effectively negate these purposes and the provisions arrived at to effectuate them, could not be further from the intent of the Decree as derived from its language.

The United States and those defendants opposed to race-based layoffs now argue that the Consent Decree, by remaining silent on the issue of layoffs, meant for

those layoffs to be controlled by state law[2] or other contract. This argument is wholly without merit: the Decree so provided where the parties agreed that state law control. *See, e.g.,* ¶ 3(d), citing N.J.S.A. 11:22–10.1, 11:22–10.3. Furthermore, it is well settled that, where such law conflicts with the enforcement of federal civil rights laws, neither state law nor contractual rights attained through collective bargaining, shall stand. *See Stotts v. Memphis Fire Department,* 679 F.2d 541, 566 (6th Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 2451, 77 L.Ed.2d 1331 (1983), citing *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971); *Brown v. Neeb,* 644 F.2d 551, 563 (6th Cir.1981); *Sarabia v. Toledo Police Patrolman's Association,* 601 F.2d 914, 981 (6th Cir.1979). In the cities of New Jersey, just as in Boston or Memphis, seniority-based layoffs would "make a mockery of the equitable relief already granted," *Boston Chapter, N.A.A. C.P. v. Beecher,* 679 F.2d 965, 974–75 (1st Cir.1982), *vacated as moot,* 103 S.Ct. 2076 (1983); *Brown v. Neeb, supra,* 644 F.2d at 563–64. Overriding the statutes and contracts which provide for such layoffs is, therefore, necessary. *See Oliver v. Kalamazoo Board of Education,* 706 F.2d 757, 763–65 (6th Cir.1983).

Nor are the arguments that the Consent Decree was drafted with the intent that seniority govern persuasive. That the Decree utilizes state law in many respects does not convince the court that the parties meant to preserve New Jersey state civil service law intact. Where such law was to govern, the Decree so provided—for example, firefighters "on layoff" at the time the Decree was entered into were not to be affected by the Decree's annual interim goals for the appointment of minority firefighters. Rather, their reemployment was to be governed by the provisions of N.J. S.A. 11:22–10.1 and 11:22–10.3. The Decree did not, however, address future layoffs, though it could have. And while the Decree was drafted so as to conform to state law where possible, it avoided that law in many significant respects: existing eligibility lists were, for the most part, to be disregarded, ¶ 2; annual interim hiring goals were established, ¶ 3; and the civil service written examinations were, pending validation, to be used only on a qualifying basis with other selection devices, such as a job-related physical performance examination, to be utilized for ranking. ¶ 4(b). In practice, the Decree has often resulted in bypassing state law requirements, as occurred recently, for example, with respect to certain appointments in New Brunswick. Finally, past practice under the Decree does not indicate that seniority was meant to govern in the event of layoffs. The United States notes that layoffs disproportionately affecting minority firefighters have gone unobjected to in prior instances, but correctly adds that, upon objection, the result was the creation of a form of constructive seniority for the minorities involved. *See* Response of United States to Order to Show Cause (1/11/84) at 4, n. 5.[3]

It is true that, as certain parties argue, this case involves the effect of a consent decree explicitly disclaiming the existence of discrimination, rather than a judicial order entered pursuant to a finding thereof.

---

**2.** The court recognizes that state law would mandate that seniority govern the layoffs here at issue. N.J.S.A. 40A:14–25. *See also* N.J.S.A. 11:21–9, 11:22–10.1; N.J.A.C. 4:1–24.2(a)(5).

**3.** Additionally, the parties make much of the court's October 12, 1982 Bench Opinion regarding Jersey City, wherein it construed a consent decree other than the one here at issue. Jersey City had engaged in the wholesale layoff of senior firefighters, after it had been compelled to hire minorities pursuant to the underlying Consent Decree. The court concluded that the layoffs were not in good faith, so much so that

it stated: "If the purpose of laying off 50 or more firefighters was to incite them, their friends and families, intimidate the minorities who have just been employed, and polarize the community, no hooded nightriders could have done it better." The court therefore held that such layoffs did not comport with the supplemental agreement reached which *specifically* dealt with the subject of layoffs. *See* Consent Decree (7/27/82) ¶ 5. The court finds no inconsistency in its two opinions, but if one is deemed to exist, the prior opinion is specifically overruled to that extent.

Nonetheless, courts have held that, where a consent decree exists, "it would frustrate the purposes of Title VII to treat the absence of evidence about ... discrimination in transfer and promotion policies, and [defendant's] denial of liability for such discrimination, as insuperable obstacles to the ordering of affirmative action in transfers and promotion." *E.E.O.C. v. American Telephone & Telegraph Co.*, 419 F.Supp. 1022, 1038–40 (E.D.Pa.1976), *aff'd*, 556 F.2d 167 (3d Cir.1977), *cert. denied*, 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978). *See also Stotts, supra*, 679 F.2d at 560 (entry of a consent decree indicates, at least, "a determination of a probability of success on the merits" of proving discrimination), citing *Culbreath v. Dukakis*, 630 F.2d 15, 213 (1st Cir.1980). Therefore, it is entirely proper for the court to modify the Consent Decree in a substantive manner contemplated by the Decree itself even absent an evidentiary hearing. *Delaware Valley Citizens' Council v. Commonwealth of Pennsylvania*, 674 F.2d 976, 981 (3d Cir.), *cert. denied*, 459 U.S. 905, 103 S.Ct. 206, 74 L.Ed.2d 165 (1982). In sum, nothing stands in the way of the court's exercise of its discretionary power to modify this Decree.

### 2. *Title VII and Seniority*

The court is wary, as it must be, of supervening legitimate seniority systems. Indeed, the structure of the relief herein provided gives voice to the genuine concern which the court recognizes in diminishing the hard-earned seniority rights of nonminority firefighters. That concern is also expressed in various provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* For example, section 703(h) of the Act states:

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin ...

42 U.S.C. ¶ 2000e–2(h). The Act thus vindicates the congressional purpose in retaining seniority systems even as it enacts broad, remedial civil rights legislation. *See, e.g., American Tobacco Co. v. Patterson*, 456 U.S. 63, 72–73, 102 S.Ct. 1534, 1539–1540, 71 L.Ed.2d 748 (1982); *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 350–55, 97 S.Ct. 1843, 1862–65, 52 L.Ed.2d 396 (1977).

However, while a bona fide seniority system may not constitute a violation of Title VII, even if it perpetuates the effects of past discrimination, *see Teamsters, supra*, the Act does not insulate such systems from alteration as an aspect of the relief available under the Act. Indeed, given a finding of discrimination, "the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate ...." 42 U.S.C. § 2000e–5(g). These remedial provisions have been interpreted by the Supreme Court broadly, to allow for awards of constructive seniority to victims of discrimination, in order to make them whole. *See Franks v. Bowman*, 424 U.S. 747, 762–70, 96 S.Ct. 1251, 1263–67, 47 L.Ed.2d 444 (1976). Section 703(h) of the Act does not stand in the way of such relief. That section merely defines the violation: it "does not purport to qualify or proscribe relief otherwise appropriate under the remedial provisions of Title VII." 424 U.S. at 758, 96 S.Ct. at 1261. *See also Bolden v. Pennsylvania State Police*, 578 F.2d 912, 921 (3d Cir.1978) (citing cases). Hence, the existence of a bona fide seniority system does not prohibit the relief here prescribed.

The United States, the State of New Jersey, and other of the parties now argue that the remedial relief available under Title VII should be available only to identifiable victims of discrimination, and not to classes of persons only putatively discrimi-

nated against. This argument is not supported by Supreme Court authority and, indeed, flies in the face of precedent in this Circuit. Thus, in *E.E.O.C. v. American Telephone & Telegraph Co.*, 556 F.2d 167 (3d Cir.1977), *cert. denied*, 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978), the Third Circuit affirmed the denial of a motion by a union to modify a consent decree containing an "affirmative action override." The court made clear that where a decree, even one not explicitly admitting the existence of discrimination, is meant to address the problems of a class of persons, class-wide relief is justified such class contains persons not identifiable as victims of specific discrimination. The court stated:

> We do not think that Congress, in enacting Title VII, intended that § 706(g) remedies be available only to those knowledgeable enough and militant enough to have demanded and been refused what was not in fact available.

556 F.2d at 175, citing *United States v. International Union of Elevator Constructors*, 538 F.2d 1012, 1019–20 (3d Cir. 1976). Nor did the court find the last sentence of section 706(g) to comprise contrary authority, as the United States, for example, argues. That sentence reads

> No order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin …

42 U.S.C. § 2000e–5(g). The court held that this sentence "merely preserves the employer's defense that the non-hire, discharge, or non-promotion was for a cause other than discrimination." 556 F.2d at 176. It did not, however, see this as a bar to relief of any sort, and, indeed, found "a

firm consensus in the courts of appeals upon the lawfulness of class-based hiring preferences and membership goals." *Id.* at 177 (citing cases). *See also Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 398–99, 102 S.Ct. 1127, 1135–36, 71 L.Ed.2d 234 (1982) (class wide relief available even where entire class has not met the Title VII filing requirement, and over objections of non-culpable union members). Finally, the court addressed the issue of the hardship of class-based, seniority-oriented relief on incumbent employees:

> … those incumbent employees will be affected identically by a remedy in favor of identifiable victims of specific discrimination as by a remedy which includes employee members not so identifiable. The impact on incumbent employees goes to the scope rather than the availability of class relief.

556 F.2d at 177 (citing cases). Here, the scope of that relief is appropriately narrow: as in the *A.T. & T.* case, the court's modification of the Consent Decree will affect "not all seniority rights, but only some." *Id.* at 174. Neither promotional and transfer rights, nor pension or salary levels are affected by this Decree: only one's position with respect to layoffs is addressed. Furthermore, it is the intention of the court that, in the event of layoffs, the same proportion of minorities survive reductions in force as were employed prior to such reductions. Only to the extent the hiring goals were actually achieved shall they therefore be maintained. Those who are kept and those who are not will be determined in accordance with seniority to the maximum extent possible. It is only if this results in a disproportionate effect upon minority employees that an adjustment need be made, and such adjustment should itself reflect employees' respective seniority positions. Thus, as between two nonminority employees, one of whom must be laid off in order to maintain the proper proportion of minority firefighters, the least senior must go. Furthermore, the system here put in place by the court is, of

course, meant to be temporary. When, in the course of time, minority firefighters attain the seniority rightfully theirs, this kind of relief will no longer be necessary, for they will then be laid off, in the event of economic hardship, in the proper proportions. In the meantime, however, a system is necessary that will protect the affirmative action plan now in place and just beginning to have its effect.

This system accords with Supreme Court precedent as it now stands, is mandated by the decision of the Court of Appeals for the Third Circuit,[4] and by the relevant decisions in other circuits. *Stotts, supra,* 679 F.2d at 564–67; *Beecher, supra,* 679 F.2d at 973–75, citing, *e.g., Guardians Association v. Civil Service,* 633 F.2d 232, 253 (2d Cir.1980), *cert. denied,* 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981); *Association Against Discrimination v. City of Bridgeport,* 647 F.2d 256, 273–74 (2d Cir. 1981), *cert. denied,* 455 U.S. 988, 102 S.Ct. 1611, 71 L.Ed.2d 847 (1982). It is, especially in light of the compensation scheme detailed *infra,* a system both necessary and just.

### B. *Compensation*

■ The court also concludes that those firefighters who have or will forfeit their seniority rights as a result of the affirmative action plan discussed above ought to be compensated and that such compensation ought to come from the federal government. The right to such compensation stems from the fifth amendment to the Constitution, which states, in pertinent part:

No person shall ... be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

While the issue of what is a "taking" under the final clause of this amendment is one that continues to befuddle the courts, *see, e.g., Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 426, 102 S.Ct. 3164, 3171, 73 L.Ed.2d 868 (1982), there is no question of the purpose of the clause.

The Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.

*Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960), cited in *e.g., Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 123, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). As Justice Holmes said in the seminal case of *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 416, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922), justifying the application of the amendment, "We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."

That these principles apply to the instant case is undeniable. Although affirmative action arises out of "a strong public desire to improve the public condition," fairness and justice dictate that the resulting burdens ought to be borne at least in large measure, by the public. Nor does the fact that the takings clause has been applied primarily to real property or the accouterments thereof preclude its application here. The clause has been applied by the Supreme Court to such intangible rights as liens, *Armstrong, supra,* causes of action, *Logan v. Zimmerman,* 455 U.S. 422, 428–33, 102 S.Ct. 1148, 1153–56, 71 L.Ed.2d 265 (1982), and even to contractual rights—the type of property here before the court.

---

**4.** The parties argue that the case of *Jersey Central Power & Lighting Co. v. Local Unions ... of the IBEW,* 508 F.2d 687, 705–10 (3d Cir.1975), *vacated and remanded,* 425 U.S. 987, 96 S.Ct. 2196, 48 L.Ed.2d 812 (1976), *remanded,* 542 F.2d

8 (3d Cir.1976), is contrary authority. The court regards that case as overruled in significant parts by *Franks, supra,* and in remaining part by the subsequent Third Circuit cases cited herein.

*United States Trust Co. v. New Jersey,* 431 U.S. 1, 19 n. 16, 97 S.Ct. 1505, 1516 n. 16, 52 L.Ed.2d 92 (1977). Moreover, "property" within the meaning of the due process clause, as it appears beside the takings clause in the same constitutional amendment, and again in the fourteenth amendment, has long been defined to encompass public employment and the rights deriving therefrom. *See, e.g., Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Though the deprivation of a property right which entitles one to certain procedures under the due process clause may not amount to a taking, it would be anomalous if the *type* of thing which constitutes "property" for the purposes of one clause, does not constitute "property" for purposes of the next. Indeed, courts have applied precisely the same analysis to both clauses. *See, e.g., Frazier v. Lowndes County, Mississippi Board of Education,* 710 F.2d 1097, 1100–01 (5th Cir.1983).

For these reasons, the rights of nonminority firefighters to the seniority they have attained, indeed, to their jobs in the factual situation here under consideration, must be considered property rights.[5] That the government action has an enormous economic impact is undeniable; that it interferes with expectations backed by the investment of time is obvious; and that such action is solely the result of federal intervention with private rights cannot be disputed. It therefore falls solidly within the taking analysis set forth by the Supreme Court. *See, e.g., Loretto, supra,* 458 U.S. at 432, 102 S.Ct. at 3174. Compensation therefore must be paid.

The amount of such compensation must, however, be "just." It is not intended to be a lifetime pension. Those senior firefighters who are laid off as a result of the affirmative action plan shall be under a duty to mitigate damages, by seeking to obtain other employment. Any claim for compensation shall be reduced by the amount of salaries or any benefits received as a result of such layoff. Moreover, the period of compensation shall end upon the attainment of other employment, but, absent exceptional circumstances, no later than one year from the date of layoff. Any disputes as to the amounts to be paid hereunder, and any applications for extension of the one-year period to obtain other employment shall be submitted to a special master to be appointed by the court. Hence, the burden on the government, while appropriately placed upon its shoulders, shall be reduced in accordance with accepted principles of contract damages and equitable relief.

**5.** Certain of the parties argue that *Stotts, supra,* stands for the proposition that a reasonable affirmative action consent decree does not entitle those aggrieved by it to compensation. Though the *Stotts* court paints with a broad brush in holding that "a reasonable consent decree which embodies an affirmative action plan does not affect any legally protected interest of non-minorities," 679 F.2d at 558, *see also Stotts v. Memphis Fire Dept.,* 679 F.2d 579, 582 (6th Cir.1982) (promotions), it does not utilize a taking analysis in so holding. Rather, the court seeks to avoid a wholesale collateral attack upon consent decrees, seeking damages on grounds of reverse discrimination. 679 F.2d at 558, citing, *e.g., O'Burn v. Shapp,* 70 F.R.D. 549, 553 (E.D.Pa.), *aff'd,* 546 F.2d 418 (3d Cir.1976), *cert. denied,* 430 U.S. 968, 97 S.Ct. 1650, 52 L.Ed.2d 359 (1977). This court agrees that such an attack would be impermissible; it is clear that reasonable affirmative action plans cannot be considered unconstitutional. However, the reasonableness of a consent decree does not preclude it from comprising a compensable taking, if it so impairs investment backed expectations as to interfere with "a fundamental element of [a] property right." *Kaiser Aetna v. United States,* 444 U.S. 164, 179–80, 100 S.Ct. 383, 392–93, 62 L.Ed.2d 332 (1979) (right to exclude). The right not to be first fired is, of course, a fundamental element of the property right of seniority. That is the element here impaired and it must, therefore, give rise to a taking. However, the court agrees with the *Stotts* court that it would be "absurd" to force municipalities to undertake the obligation of compensating senior firefighters laid off as a result of an affirmative action plan. 679 F.2d at 559. Rather, in this case, that cost should be imposed upon the federal government, the plaintiff in this action seeking to enforce federal statutory and constitutional rights.

## CONCLUSION

This case and others involving the same issues represent a turning point in our society. We cannot, either through legislation or court edict, drive bias and prejudice from the hearts and minds of the people. We can, however, condemn such bias and prejudice and prohibit them from denying constitutional rights and equality to any of our citizens. Affirmative action plans, with all of their imperfections, deficiencies and weaknesses, are a symbol of this country's willingness to correct the inequities of the past and to express a commitment to their elimination in the future. If those who have been recently hired pursuant to such plans are laid off on the assumption that the principle of seniority is more important than the eradication of discrimination, then this nation has regressed to the time in our history of which we should be the least proud.

This country owes a debt to its minority citizens to compensate them for generations of degradation and deprivation. That debt is being partially repaid by providing opportunities heretofore denied. To withdraw those opportunities now constitutes a denial of our democratic principles and a breach of faith to those who have fought and even died for them and to whom we promised that tomorrow would be better.

Accordingly, an order shall be entered modifying the consent decree to provide that in the event of layoffs: (1) minorities shall be retained in the same proportion as existed prior to the layoffs; and (2) senior persons who are laid off as a result, shall be compensated as set forth above.