**Christina FANG–HUI LIAO, Plaintiff,**

v.

**Charles H. DEAN, Jr., et al.,
Defendants.**

**Civ. A. No. 86–AR–5428–NW.**

United States District Court,
N.D. Alabama,
Northwestern Division.

May 6, 1987.

Ernest N. Blasingame, Jr., Florence, Ala., for plaintiff.

Lewis E. Wallace, Acting Gen. Counsel, Justin M. Schwann, Sr., Asst. Gen. Counsel, Thomas F. Fine, Senior Litigation Atty., John P. Kernodle, Tennessee Valley Authority, Knoxville, Tenn., for defendants.

## MEMORANDUM OPINION

ACKER, District Judge.

Christina Fang-Hui Liao sued the Directors of her former employer, Tennessee Valley Authority, invoking 42 U.S.C. § 2000e *et. seq.*, claiming that her termination by TVA as a research chemist was the result of racial and/or sexual discrimination. The court heard oral testimony and considered written evidence. The court makes the following findings of fact

which bear upon the conclusions of law which it thereafter reaches.

### Findings of Pertinent Fact

Dr. Liao is a female citizen of Chinese extraction. She was first employed by TVA on July 7, 1977, as a research scientist in the TVA's National Fertilizer Development Center (NFDC), Soil and Fertilizer Research Branch. When employed she held a Ph.D. in chemistry and was hired as a project co-leader for nitrogen research projects carried out at NFDC. Dr. Liao's entrance pay classification was SD–3, which was lower than the entrance pay classifications of white male Ph.D. research scientists employed before and after she was employed in NFDC. During her time of employment, Dr. Liao lodged written and verbal complaints with her supervisors alleging disparate treatment in several respects: (1) slow promotion and unfair differentiation in job classification; (2) lack of an exclusive laboratory and a laboratory assistant; (3) unfair performance evaluations; (4) non-exposure to educational seminars and advancement opportunities; and (5) ostracism. A good argument can be made that one or more of Dr. Liao's pre-termination complaints was valid; but the court finds it unnecessary to decide whether or not anything Dr. Liao complained of prior to her termination constituted an act motivated by sexual and/or racial discrimination, that is, except to the extent that her complaints may tend to reflect an adverse white male reaction to TVA's affirmative action program (AAP), which will be the primary subject of this opinion.

Dr. Liao's complaint arises from her termination in a reduction in force (RIF) which took place on January 8, 1982. She was chosen as the only employee in the Soil and Fertilizer Branch to be involuntarily terminated in the RIF. Dr. Bert Bock, a white male with two years less seniority than Dr. Liao, was retained. This court has no doubt that Dr. Liao's original employment with TVA was due in large measure to TVA's AAP, which had been put in place shortly prior to her recruitment. How wonderful it was to have signed up a highly qualified Ph.D. who was also Asian and female. TVA's AAP, sometimes referred to as an "Equal Opportunity Plan of Action", as revised, contains several very revealing provisions, not the least of which is the self-criticism reflected in the statistics, clearly showing that women and minority TVA employees at the higher levels were and are not representative of their relative numbers in the work force generally. Another important provision, which is contained in any serious AAP, asserts the goal of attaining an increased and more nearly representative percentage of the underrepresented groups in the employer's work force. The court has read and considered TVA's entire AAP, together with certain collateral directives involving it. The court finds it unnecessary to repeat all of the affirmative action language, but does suggest that the following have particular significance:

> As shown in Table 2, there is limited participation by women and no participation by blacks in the management schedule. The reasons are the same for both women and blacks. The vast majority of management positions in the division represents project leaders in the areas of soil science, agronomy, economics, biological sciences, or engineering. Most have "advanced degrees" in these technical fields and/or proven competence in these fields. Their classification as management reflects the past de facto recognition of the dual ladder concept rather than the supervisory concept need in many TVA organizations; hence, scientific or technical training, experience, and competence are major criteria. Very few women and blacks are pursuing advanced degrees in the agricultural sciences and engineering. Those who do are very actively recruited by industry, universities, and other government agencies. The combination of scarcity and demand has made it virtually impossible to date to recruit and retain qualified women and/or black employees in these project leader positions. We feel that participation by women in the other occupational classes is either in balance or made adequate progress during the reporting period. [because of Dr. Liao's employment?]

\* \* \* \* \* \*

There is a significant disparity in the proportion of both women and blacks in lower level positions as compared with all employees. Both women and blacks are overrepresented in lower level positions.

\* \* \* \* \* \*

There is a wide disparity between the proportion of women and blacks in upper grade levels and that of the total employment.

\* \* \* \* \* \*

*Soils and Fertilizer Research Branch* —Special recruitment efforts were made during this reporting period to find qualified women or minorities to fill two positions as research soil chemists. The first position (SD–4) requires Ph.D.-level training and experience in transformations of soil and fertilizer nitrogen and proven ability to perform independent research. Repeated contacts with a number of land-grant universities and personal contacts with established researchers and graduate professors yielded no minority or women candidates and only two qualified white male applicants. An offer was made one of the applicants, and he has accepted employment beginning October 1979.

\* \* \* \* \* \*

A woman of Asian origin [Dr. Liao] was reclassified from Research Chemist, SD–3, to SD–4.

\* \* \* \* \* \*

In the M Schedule [Dr. Bock is an M–5] professional categories the division is underrepresented in all protected class groups. In the SD schedule professional categories we have severe underrepresentation in all protected class groups with the exception of white and black females at the SD–1 level and black males at the SD–2 level. [Dr. Liao was an SD–4 at the time of her termination].

\* \* \* \* \* \*

For Managers/Administrative, the internal work force has been our primary source. Since only white males occupied all of these positions, it is obvious that other sources should have been used more extensively.

\* \* \* \* \* \*

[F]or most of the professional position vacancies, we have had no applicants from the protected class groups. This points up again our need to intensify our recruitment efforts for candidates from the protected class groups at all levels so that we will have a readily available pool of qualified applicants to draw upon.

\* \* \* \* \* \*

[A]s pointed out earlier, in the occupations of Managers/Administrative and Life/Physical Scientists (both on the M scheduled and the SD schedule), we had only white male applicants, which emphasizes again our need for more intensive and extensive recruitment efforts.

\* \* \* \* \* \*

One Asian American female [Dr. Liao] was employed in this occupation during this period and received a promotion in FY 1979 ...

\* \* \* \* \* \*

Unfortunately, immediate vacancies for critical positions are difficult to hold for long-term recruitment or training strategy. Better planning and knowledge of minority opportunities are essential for corrective measures.

\* \* \* \* \* \*

The division goals are ambitious. All 11 vacancies are targeted to be filled with women or minorities. Our AAP is structured so as to identify applicant pools and overcome recruitment barriers to the extent possible for both internal and external sources. Recruitment strategies include a concerted effort to recruit and promote from within the division and TVA as well as extensive effort from the civilian labor force.

We anticipate that we will have to spend an inordinate amount of time recruiting Hispanics, Asian Americans, and American Indians. We expect more contact with organizations representing these groups along with more assistance from the Office of Personnel; however, we are confident that our hiring goals are achievable if budgets and manpower ceilings permit.

In a memorandum to all TVA employees dated May 24, 1979, the TVA chairman said:

Employees who have managerial or supervisory oversight of any kind have a special obligation to aggressively carry out TVA's policy on equal employment opportunity. You are expected to vigorously support all affirmative action programs designed to eliminate the present effects of past discrimination and to make sure all employment decisions are free from prohibited discrimination.

When budgetary constraints were imposed by the Government, a communication was received by TVA from the Office of Personnel Management under date of June 5, 1981. It said, *inter alia:*

In line with the President's commitment to reduce the level of Government spending and thereby help restore the vitality of the nation's economy, most of you will be operating under budget restrictions and reduced personnel ceiling levels during the next few years.

 \* \* \* \* \* \*

For those agencies faced with a reduction-in-force, it is important to bear in mind the potential impact on veterans, handicapped, minority and female employees. In addition, agencies which will be hiring new personnel should consider using reemployment priority lists established by other agencies which have been subject to RIFs. Because of a tendency toward a "last hired, first fired" effect of RIF procedures, veterans, handicapped, minorities and women employed recently as a result of previous affirmative action efforts may be well represented on such lists. Of course, agencies are not excused from RIF laws and regulations when they make such considerations.

TVA's Director of Equal Opportunity Compliance circulated internally this communication with an accompanying memorandum entitled "Affirmative Action Efforts During Reduced Employment Period". It was graphic in its import.

With the foregoing language having been unilaterally adopted by TVA and disseminated to its employees, along came budget cutting time in 1981. This necessarily meant that there would be a RIF, which, in turn, meant that·TVA and Dr. Liao's department in it had to make decisions as to which employees to keep and which employees to cut. Dr. Liao's department, with TVA's Personnel Department concurring, decided to terminate one SD–4 level job position. This was a euphemistic way of deciding to terminate Dr. Liao, because the description fit Dr. Liao and no other. It neatly avoided the termination of the M–5 level white male research chemist, Dr. Bock, who was employed two years after Dr. Liao.

It is unnecessary to this decision for the court to determine whether or not Dr. Bock was given his promotion to M–5 in anticipation of a possible future RIF so that in such an unhappy event a seemingly logical distinction could be made between an M–5 and an SD–4. Such an anticipatory decision would constitute an act of disparate treatment at the time it was made, if such were its purpose. It is certainly true that if Dr. Liao had been designated M–5, as perhaps she should have been, it would have been impossible to disguise the decision to prefer Dr. Bock over Dr. Liao during the RIF. TVA attempted to frame its RIF decision in objective terms. The discussions which led to the decision make it obvious that the idea was to eliminate Dr. Liao, the only SD–4 in the department. The choice for termination was clearly between Dr. Liao and Dr. Bock, and not between job classifications. Therefore, the decision was both subjective and in violation of the express provisions of the AAP, as well as in violation of the philosophy and purpose of affirmative action plans in general. The RIF decision may have had a rational basis in that the alleged weaknesses and strengths of Dr. Liao and Dr. Bock were discussed by the decision-makers. If the fear of the AAP did not dominate these discussions, it pervaded the process and was an occasion for some consternation by the decision-makers. Although Dr. Liao and Dr. Bock were not performing precisely the same work, their work was substantially similar, and their academic qualifications were virtually identical. The only real distinction between them was that

their supervisors liked Dr. Bock better than they liked Dr. Liao. A comparison of their respective personalities definitely played a large part in the decision. Of course, there can be no more subjective criterion for an employment decision than "personality".

Although the RIF decision attempted to pay lip service to the AAP, TVA failed fully to anticipate the legal significance of its AAP, and by not having understood that significance, made a choice to discharge a qualified Asian woman while keeping a qualified white male with two years less service, a decision which further skewed an already admittedly badly imbalanced scientific work force as to both race and sex.

### Conclusions of Law

The court has jurisdiction over this controversy pursuant to 28 U.S.C. §§ 1331 and 1342 and 42 U.S.C. § 2000e–16(c).

As far as this court has been able to ascertain, this is a case of first impression. It asks this question: Can an employer use its voluntary, unilateral affirmative action program as a *shield* against claims of reverse discrimination without also allowing its employees to use the program as a *sword* to enforce their rights as employees with a preferred status? Dr. Liao asks this court to take the next, easy, logical step suggested by *Johnson v. Transportation Agency,* — U.S. ——, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987), decided March 25, 1987.

If this court had been asked in a case of first impression to decide the question which was presented to the Supreme Court in *Johnson v. Transportation Agency,* this court would have reached the conclusion which Chief Justice Rehnquist and Justices Scalia and White reached in dissent, although undoubtedly without Justice Scalia's eloquent way of expressing it. But this court, while not always in philosophical agreement with the Supreme Court, learned early how to count. This court quickly recognizes that six beats three by a healthy margin. In *Johnson v. Transportation Agency,* the Court was dealing with a public employer whose unilaterally adopted AAP not only expressly permitted but encouraged employment decision-making that took into account race and sex.

The avowed purpose of the AAP was to achieve a work force more representative of the sex and race of the working community. The court of appeals in *Johnson v. Transportation Agency* had recognized that the AAP there had been adopted to address a conspicuous imbalance in the Transportation Agency's work force. The similarities between the AAP adopted by Transportation Agency and the AAP adopted by TVA are impressive. In *Johnson v. Transportation Agency,* the Supreme Court says:

The Plan noted that this underrepresentation of women in part reflected the fact that women had not traditionally been employed in these positions, and that they had not been strongly motivated to seek training or employment in them "because of the limited opportunities that have existed in the past for them to work in such classifications." [citation omitted] The Plan also observed that, while the proportion of ethnic minorities in the Agency as a whole exceeded the proportion of such minorities in the county work force, a smaller percentage of minority employees held management, professional, and technical positions. [footnote omitted].

The Agency stated that its Plan was intended to achieve a "statistically measurable yearly improvement in hiring, training and promotion of minorities and women throughout the Agency in all major job classifications where they are underrepresented." [citation omitted]. As a benchmark by which to evaluate progress, the Agency stated that its long-term goal was to attain a work force whose composition reflected the proportion of minorities and women in the area labor force. [citation omitted].

107 S.Ct. at 1446–47.

This description reflects TVA's stated purpose for its AAP. The Court, after discussing the AAP itself, goes forward to explain that *Steelworkers v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), "was grounded in the recognition that voluntary employer action can play a crucial role in furthering Title VII's purpose of eliminating the effects of discrimi-

nation in the work place...." 107 S.Ct. at 1451. As is true in Dr. Liao's case against TVA, the Court says of Transportation Agency's AAP: "For positions requiring specialized training and experience, the Plan observed that the number of minorities and women 'who possess the qualifications required for entry into such job classifications is limited' ". *Id.* at 1454. The Court next says: "From the outset, therefore, the Plan sought annually to develop even more refined measures of the underrepresentation in each job category that required attention". *Id.* at 1454. Finally, the Court concludes: ... the Agency's Plan was intended to *attain* a balanced work force, not to maintain one". *Id.* at 1456 (emphasis in original). While Transportation Agency's AAP did not expressly provide for "quotas" and attempted to maintain some flexibility, it had the earmarks of an internal mandate, just as TVA's AAP does.

In the context of conflicts like this one, this court can detect no rational distinction between a consent decree to which certain employees and the employer are privy and an AAP adopted for the express benefit of certain employees. If an employee who is granted a preferred status by court decree can enforce that judicially mandated preference, why should not the beneficiary of an AAP be able to do the same?

█ Predicting that a case like Dr. Liao's case would come along, and even inviting it, Justice Stevens in his concurring opinion uses the "shield and sword" analogy in this clear language:

> While I join the Court's opinion, I write separately to explain my view of this case's position in our evolving antidiscrimination law and to emphasize that the opinion does not establish the permissible outer limits of voluntary programs undertaken by employers to benefit disadvantaged groups.
>
> Antidiscrimination measures may benefit protected groups in two distinct ways. As a sword, such measures may confer benefits by specifying that a person's membership in a disadvantaged group must be a neutral, irrelevant factor in governmental or private decisionmaking or, alternatively, by compelling decisionmakers to give favorable consideration to disadvantaged group status. As a shield, an antidiscrimination statute can also help a member of a protected class by assuring decisionmakers in some instances that, when they elect for good reasons of their own to grant a preference of some sort to a minority citizen, they will not violate the law.

107 S.Ct. at 1457–58.

\* \* \* \* \* \*

> It remains clear that the Act [Title VII] does not *require* any employer to grant preferential treatment on the basis of race or gender, but since 1978 the Court has unambiguously interpreted the statute to *permit* the voluntary adoption of special programs to benefit members of the minority groups for whose protection the statute was enacted.

107 S.Ct. at 1458–59 (emphasis by Justice Stevens).

Once the employer is *permitted* voluntarily to adopt an AAP "to benefit members of the minority groups for whose protection the statute was enacted", the employer is then *required* to adhere to its own program. Otherwise, the adoption of an AAP would be meaningless. This court finds that by adopting its AAP for the avowed purpose of attaining a more balanced work force, Dr. Liao's employer not only succeeded in insulating itself from most complaints of reverse discrimination but placed in the hands of Dr. Liao and other protected employees a Title VII sword they would not otherwise have been able to wield. Defendants here cannot use their own self-mandate when convenient and ignore it when they find it bothersome. To allow an employer, particularly a public employer, that brags in its own AAP materials about having hired and promoted its only Asian female Ph.D., to shelve its AAP when RIF time arrives, would be to encourage an hypocrisy which Justice Stevens and the other members of the majority in *Johnson v. Transportation Agency* could not tolerate. Unless the Supreme Court some day decides to rethink the whole concept of affirmative action as a tool for achieving employment equity, this tool seems to be

permanently available, because the perfect society is not yet in sight.

TVA's argument would have more merit if Dr. Bock had been retained because of *seniority,* even though this AAP contains no exceptions in recognition of seniority. As recognized in *Britton v. South Bend Community School Corp.,* 775 F.2d 794 (7th Cir.1985), a "no minority layoff" provision in a collective bargaining agreement is valid as against an attack by those whose seniority rights are adversely affected. This holding is similar to the holding in *Sisco v. J.S. Alberici Construction Co., Inc.,* 655 F.2d 146 (8th Cir.1981, *cert. denied,* 455 U.S. 976, 102 S.Ct. 1485, 71 L.Ed.2d 688 (1982)), which approved the retention of blacks pursuant to an AAP during a RIF in order not to worsen the employees' racial mix. An enlightening expression of the same concept is found in *Vulcan Pioneers v. New Jersey Dept. of Civil Service,* 588 F.Supp. 716 (D.N.J.1984), as follows:

> The court ... is convinced that adherence to strict contractual and statutory seniority requirements in determining who shall go and who shall stay cannot be permitted. The affirmative action plan embodied in the consent decree between the parties and the hirings pursuant thereto would be substantially eradicated thereby. The gains contemplated and those achieved would be lost.

588 F.Supp. at 717–18.

These three opinions, and Supreme Court opinions like them, are *inversely* applicable in Dr. Liao's case, because TVA cannot, and therefore does not, attempt to justify its RIF decision in terms of seniority. The only reason the court mentions this line of cases is to indicate that there is no necessity in the instant case for this court to agree or to disagree with them. They simply have no direct application.

In their post-trial brief, defendants seek to limit the inquiry to the question of whether or not "plaintiff has shown that the reasons for the RIF and the elimination of her position were pretextual". They correctly point out that the Merit Systems Protection Board, during Dr. Liao's exhaustion of remedies, recognized the following undisputed facts:

> The parties have stipulated to the fact that [Dr. Liao] has established a prima facie case of discrimination.
>
> And, also, that [TVA] has established a legitimate non-discriminatory reason for taking the [RIF] action.

Defendants pass over very lightly the implications in this case of TVA's AAP. The following contains everything which defendants say on the subject in their brief:

> The Court has directed the parties to address the issue of the role of affirmative action in the RIF here. Under the evidence, TVA's affirmative action program cannot be used to satisfy plaintiff's burden of proof.
>
> In simplest terms, there is a failure of proof. None of the evidence on affirmative action with Agricultural Development provides for using affirmative action considerations to reverse a decision to eliminate a position through RIF. A.R. 780–800. As Mr. Shields testified, he was concerned about the affirmative action effect of eliminating plaintiff's position but could not use that concern to reverse Dr. Sample's recommendation of where SFRB could take a cut and still preserve high priority work in the nitrogen area.
>
> Even if there was some proof on this point, the Supreme Court in *Wygant v. Jackson Bd. of Educ.,* [—— U.S. ——] 106 S.Ct. 1842 [90 L.Ed.2d 260] (1986), and in *Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561 [104 S.Ct. 2576, 81 L.Ed.2d 483] (1984), indicated that it was not appropriate for an employer to favor a member of one racially identifiable group over a member of another in a layoff situation. 106 S.Ct. at 1847–58; 467 U.S. at 577–83, 104 S.Ct. at 2587–90. Accordingly, if Dr. Sample had determined that plaintiff's position should be eliminated, but that a white project leader's position would be eliminated instead due solely to plaintiff's race, TVA would have been on very shaky legal ground.

Noticeably absent from defendants' brief is any reference whatsoever to *Johnson v. Transportation Agency.* This very recent

decision of the Supreme Court cannot be swept under the rug.

To fire Dr. Liao and to keep Dr. Bock, who was hired two years after Dr. Liao, can hardly be said to enhance TVA's future prospects for recruiting technically qualified females and racial minorities. The whole rationale for TVA's AAP is frustrated and made into a sham unless Dr. Liao is given the benefit of the doubt during a RIF. In this instance, TVA was perfectly aware of its AAP requirements and yet made a decision without in any way giving Dr. Liao the preferential consideration she was due under the AAP. An employer simply cannot be allowed to advertise itself as an affirmative action employer and then wink at its AAP when it gets in the way.

 Because the decision to RIF Dr. Liao instead of Dr. Bock was a clear violation of the employer's AAP, there is no good purpose to be served in going through the analysis which defendants insist upon, and outlined in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The *Burdine* analysis would be difficult, if not impossible, in this case. TVA had formally undertaken an *affirmative action obligation* to Dr. Liao. Given the added weight of this preference, there is no logical or fair way that TVA, or this court, can justify TVA's decision to terminate Dr. Liao while retaining Dr. Bock. Under the logical next step from *Johnson v. Transportation Agency,* there is no need for this court to determine whether or not TVA's decision to terminate Dr. Liao was impermissibly or directly motivated by her race and/or her sex. She was entitled to reverse, reverse discrimination.

This court does not mean to be understood as holding that there can never be a circumstance in which a person enjoying a preferred status under an AAP cannot be displaced or differentially treated in competition with another, substantially better qualified, non-protected employee. This court can easily conceive of a scenario where an affirmatively preferred person, according to the AAP, could be sufficiently inferior in qualifications to a non-preferred person as to create an excuse for not strictly applying the AAP. But this is not that case. Dr. Liao is admittedly a good chemist. She was dedicated to her job. Her performance level was recognized as more than adequate by her superiors until the RIF appeared imminent. It was at that time that her alleged shortcomings were aired, for the purpose, whether covert or overt, of providing an escape from the AAP mandate.

To end on a trite but serious note, TVA is hoist on its own petard, as many other employers soon may be.

By separate decree, Dr. Liao will be reinstated with back pay.